404 Mich. 216 (1978)
273 N.W.2d 35
IN THE MATTER OF BABY BOY BARLOW
(ROBARDS
v.
BARLOW)
Docket No. 60532, (Calendar No. 6).
Supreme Court of Michigan.
Argued June 7, 1978.
Decided December 28, 1978.
James K. Jesse for respondent Robards.
John F. Rohm for petitioner Barlow.
Amicus Curiae:
Seymour, Seymour, Conybeare & Straub for Child and Family Services of Michigan, Inc.
RYAN, J.
In bringing this appeal, the plaintiff-appellant raises important questions of first impression arising under the Michigan Adoption Code, MCLA 710.21 et seq.; MSA 27.3178(555.21) et seq., effective January 1, 1975. Appellant asks us to reverse the Court of Appeals affirmance of an order of the probate court terminating his parental rights, pursuant to the Adoption Code, to a child fathered by him and born out of wedlock on *223 July 28, 1975. We conclude the probate court erred in finding that the best interests of the child mandated terminating appellant's rights.
I
On July 29, 1975, one day after the birth of the child we will call Baby Boy Barlow, his mother, the appellee in this case, voluntarily placed him with an agency, Child and Family Services, Inc., with the ultimate goal of seeing him placed in a home for purposes of adoption. Temporary care of the child has been provided pending the outcome of these proceedings.
On September 4, 1975, a statutory petition for hearing to identify the child's father and to determine or terminate his rights[1] was filed in the Berrien County Probate Court and a copy was served on appellant.
On September 23, 1975, prior to the scheduled September 30 hearing on the petition, the appellant filed a petition admitting paternity and praying for custody of the child.
At the September 30 hearing, it was determined that the parties had no objection to the court determining that appellant was the father of the child. It was also agreed that appellant would begin making regular child support payments for the care and welfare of the infant. A further hearing was then scheduled for October 27, 1975 to take up the matter of custody.
At the October 27, 1975 hearing, appellant testified that he was 19 years of age and had known the child's mother for approximately two years. He said that shortly after he learned that the appellee was expecting their child, he asked her to *224 marry him. The parties eventually agreed to be married; a wedding was planned and finally cancelled.
During this period and until shortly before the child's birth, the parties discussed and received counseling concerning custody of the boy or his being placed for adoption. Appellant desired custody of the child; the child's mother preferred adoption. No resolution was reached.
Appellant admitted that he did not contribute to appellee's medical expenses associated with the child's birth or to the child's support until after receiving the petition for hearing.
Appellant testified that he had graduated from high school in June of 1975, had been employed since June of 1974 and was a foreman on the second shift at a factory in the area, and for much of the same time had also been holding a second, part-time job. He had saved some money and had made tentative plans with his mother and sisters to care for the child during his working hours.
A number of witnesses then gave favorable testimony concerning appellant's fitness to care for a child. Appellant then rested his case.
The appellee testified that she believed that the child's best interests would be served by placing him for adoption. Her opinion was concurred in by others, including placement workers associated with Child and Family Services.
At the request of counsel, the matter was adjourned and during the succeeding months the parties attempted, without success, to amicably resolve the matter of custody.
At an additional hearing on June 8, 1976, appellant testified that he had, in the interim, purchased a home, that his earnings had increased, that he had been paying for the child's care and *225 that he had visited with the child as often as possible.
Child and Family Services, Inc. reported that the child had been transferred to a second foster home about four months after his birth.
On July 27, 1976, the court rendered its decision and terminated appellant's parental rights.[2]
An appeal as of right was taken to the Court of Appeals[3] which remanded the case to the probate court for more specific findings of fact.
That probate court's supplemental statement of findings recited that the father was not unfit to care for the child in the sense that term is used in cases involving abused, dependent or neglected children.
However, the court reaffirmed its conclusion that it would not be in the best interests of the child to award custody to his father based on a finding that appellant could not properly care for the child, that no emotional ties had developed *226 between the child and his father, that appellant was not inclined to raise the child in his religion and that it would be better for the boy to be adopted by his "foster parents".
An order was entered terminating appellant's parental rights. The probate court's decision was affirmed by the Court of Appeals. In the Matter of Baby Boy Barlow, 78 Mich App 707; 260 NW2d 896 (1977). We granted leave to appeal. 402 Mich 856 (1978).
II
The time has long since passed when children born out of wedlock had no rights derived from their relationship to their natural parents and the parents had no rights with respect to their illegitimate children.
Justice (then Judge) LEVIN, writing for a panel of the Court of Appeals in In re Mark T, 8 Mich App 122; 154 NW2d 27 (1967), reviewed the early history of the common law concerning custody of illegitimates.
"Originally, in English law, the illegitimate child was the ward of the parish because, in one of the less charming fictions of our early common law, he did not exist.
"`The common law of England did not contemplate illegitimacy and, shutting its eyes to the facts of life, described an illegitimate child as filius nullius.' Galloway v Galloway (1955, HL), [1956] AC 299, 310, 311 (3 All Eng Rep 429, 431)." 8 Mich App 122, 136.
Consistent with the early common-law rule that the mother of a legitimate child had no custody *227 rights,[4] the illegitimate, considered incapable of having a father known to the law,[5] was said to be a filius nullius, the child of nobody, and a ward of the parish. Over time, the law developed to recognize custody rights to an illegitimate child, first of all in the mother only.[6]
The general rule stated in the cases is that, as in the case of legitimate children,[7] the mother is the natural guardian of her child and has a primary right to his or her custody, subject always to the child's best interest. In re Mark T, supra; Anno: Right of mother to custody of illegitimate child, 98 ALR2d 417. See, also, In re Mathers, 371 Mich 516; 124 NW2d 878 (1963).
A number of courts have stated that, subject to the best interests of the child, after the mother the putative father of an illegitimate child has custody rights paramount to those of any other person. Caruso v Pima County Superior Court, 100 Ariz 167; 412 P2d 463 (1966); In re Baby Boy Shady, 264 Minn 222; 118 NW2d 449 (1962); Commonwealth ex rel Human v Hyman, 164 Pa Super 64; *228 63 A2d 447 (1949); In the Matter of Estate of Moore, 68 Wash 2d 792; 415 P2d 653 (1966). See, also, Anno: Right of putative father to custody of illegitimate child, 45 ALR3d 216. Recognition of a superior right to custody in the father has been justified as derivative of statutory obligations to support the child, see, e.g., In re State in Interest of Baby Girl M, 25 Utah 2d 101; 476 P2d 1013 (1970); In the Matter of the Guardianship of C, 98 NJ Super 474; 237 A2d 652 (1967); and as resulting from the court's deference to natural family relationships, In the Matter of Fierro v Ljubicich, 5 Misc 2d 202; 165 NYS2d 290 (Supreme Ct, 1957).
Concerning illegitimate children, the courts have disagreed, as they have in disputes concerning legitimate children, over whether the best interests of the illegitimate child are served by granting custody to a natural parent rather than a third party unless the parent is shown to be unfit or whether the welfare of the child, irrespective of any showing of unfitness, should be the central matter for concern. In re Maria S Weldon, 397 Mich 225; 244 NW2d 827 (1976); Note: Alternatives to "Parental Right" in Child Custody Disputes Involving Third Parties, 73 Yale LJ 151 (1963).
III
The precise issue before us is termination of parental rights. We must look to the Michigan Adoption Code, supra, for guidance in the resolution of this matter.
In enacting the Adoption Code, the Legislature sought, inter alia, to establish procedures to provide for speedy resolution of disputes concerning a *229 putative father's rights where placement of an illegitimate child for adoption is sought.[8] A putative father's parental rights are subject to termination only after the father is afforded notice and an opportunity to be heard. MCLA 710.36; MSA 27.3178(555.36).
The Adoption Code also provides substantive standards for deciding when a putative father's rights may appropriately be terminated. Section 39 of the code creates two categories of putative fathers and provides different standards for termination of the rights of each. Putative fathers who have established no custodial relationship with the child, and who have provided no support for the mother or child prior to the notice of hearing, may have their parental rights terminated if the court finds, after examining the father's fitness and ability to properly care for the child, "that it would not be in the best interests of the child to grant custody" to him. The parental rights of the second group, those who have established some kind of custodial or support relationship prior to the notice of hearing, are subject to termination only by proceedings under the general jurisdictional provisions of chapter 12A of the Probate Code.
In the case before us, the probate court found that appellant had not established any custodial or support relationship prior to being served with notice of hearing, and thus was subject to suffer the termination of his parental rights if it would not be in the best interests of the child to grant custody to his father.
A
Prior to the enactment of the Adoption Code it *230 had been held, in a case factually similar to the one at bar, that it is presumed that a child's best interests lie with his natural parent's exercise of custodial rights, absent a showing of that parent's unfitness or of neglect or abandonment of the child, and that for purposes of making that determination, it is improper to compare the parental home with the proposed alternative. In the Matter of Robert P, 36 Mich App 497; 194 NW2d 18 (1971). This holding was consistent with this court's settled precedent in custody cases which pitted the natural parents of legitimate children and unwed mothers against third parties. See In re Ernst, 373 Mich 337; 129 NW2d 430 (1964); In re Mathers, supra.
We think it is clear that, in creating two categories of putative fathers and subjecting those in appellant's circumstances to having their parental rights terminated on a showing that it would not be in the best interests of the child to grant custody to the father, the Legislature rejected the view that cases like the one before us should turn upon a showing or failure to show that the putative father is unfit.
The probate court properly, then, continued its inquiry under § 39(1) after finding appellant not unfit.
B
The court next turned to a consideration of the appellant's ability to properly care for the child and, in general, the child's best interests. The findings of the court state:
"The court finds that the father does not have the *231 ability to properly care for this child. The father is young, immature and unmarried. His care plan involves the extensive aid of his 18-year-old unmarried sister, a 22-year-old divorced sister and his mother, who would care for the child while he is working. The child would be cared for at various times in the paternal grandmother's home, the divorced sister's home and the father's home with all three of them having child raising responsibilities. This plan is very nebulous as the [22-year-old re]married sister and the paternal grandmother testified that no plans for caring for the child had been worked out.
"The father has minimal knowledge of the fundamental requirements involved in raising a child and has had minimal experience in the full responsibility of child raising."
Upon review of the entire record, it is our respectful conclusion that the court's findings are not sustained by the evidence. GCR 1963, 517; In re Mathers, supra.
The court's finding that appellant is unable to provide proper care for his child is simply without support in the record. Youth and marital status are not evidence of either an incapacity or disinclination to assure that a child will receive adequate care and supervision. The record does not disclose the kind of lack of maturity that would support a finding that appellant is unable to properly care for his child. Although appellant may have been possessed of only "minimal knowledge of the fundamental requirements involved in raising a child", the record belies any suggestion that appellant is incapable of learning what most adult human beings quickly learn upon the birth of a first child.
Moreover, appellant's plan for his mother and *232 sisters to sit for the child cannot be deemed to be improper care.[9]
Finally, to the extent the court's finding suggests that the child will receive "better" care if placed for adoption, we find the court erred. Again, there is no substantial evidence in the record that would support such a conclusion. The court was unable to point to anything in the father's situation that would make his home an unhealthy one for his child. See the remainder of the discussion under Part C, infra.
In the peculiar circumstances of this case, the competing parties are the child's natural parents. The appellee-mother had proposed to execute a release terminating her own parental rights but had not done so at the time of the hearing,[10] and the Adoption Code provides that a child may not be placed for purposes of adoption until the father's rights are terminated by the court.[11] There is no evidence in the record concerning who the future adoptive family would be.[12]
Consequently, the alternative home in which the parties' child might someday be placed is unknown *233 and unknowable. We are convinced that the possibility that there may be a better home somewhere, be it the natural mother's or an adoptive one, yet unidentified and unidentifiable, is not evidence but rather mere speculation and conjecture that it would not be in the best interests of the child to award custody to his father.
Where the identity of the child's ultimate home, if the father's rights are terminated, is unknown, there is no way to evaluate what that family's circumstances would offer. For example, it has been urged that adoptive placement in some two-parent family would be better for the child. However, while it might be assumed that an agency would place a child in a "typical" family in which the wife is not employed outside the home, and assuming without conceding that such circumstance is in terms of the child's best interests, more desirable than one in which the mother works outside the home, there might be other aspects of that family's situation, still unknown, that would weigh against this facially desirable characteristic. It is not unknown for adoptive placements to be unsuccessful. Without examining the prospective hypothetical family and the circumstances of its members, it would be impossible for the trial court to assess such family's suitability to care for the child whose interest is here in question.
We should not lose sight of what is involved in this case. It is proposed that the state terminate a natural father's parental rights, ultimately in favor of unrelated, unknown and unidentifiable third parties, indeed third parties whose existence is merely hypothetical. The task is, again, to determine if it has been proven that it would not be in the best interests of the child to place custody in the father.
*234 It would be entirely unfair to require appellant to prove that an unknown home would not be a better one[13] than that which he was prepared to provide. We cannot know whether the parent(s) in that home would be better suited to raising the infant whose interests are before us than his own father. We cannot assume, for example, that because families chosen for adoptive placements generally follow a more conventional lifestyle and have established more economic stability at a particular point in time than appellant has, they will always be better for a child.[14] It is simply impossible to predict whether an infant would turn out to be a healthier, more well-adjusted person if raised by an unidentified family rather than his concededly fit biological relatives.
We conclude, therefore, that in the absence of evidence indicating appellant's home would not be a good one for the child, as to this one of the elements comprising the totality of the child's interests, there is no basis on the record in this case for finding that it would not be in the best *235 interests of the child to award custody to his father.
C
The probate court continued its evaluation of the best interests of the child by considering the definition of that term in the Child Custody Act.[15] MCLA 722.21 et seq.; MSA 25.312(1) et seq. The parties agreed that the act applied to this dispute and neither party now objects to its application.
By its terms, the custody act applies to circuit court custody disputes. See §§ 4, 6, 7a and 8. It does not apply to termination proceedings in the probate court in general[16] which focus not on seeking to maximize a child's interest by deciding which of two competing parties should be awarded custody, but rather on the circumstances of a *236 parent, the termination of whose rights is sought. The Legislature has, however, set forth a number of areas of concern in that act which it deemed should be evaluated in a large category of inquiries into a child's welfare. In distinguishing the class of fathers to which appellant belongs, the Legislature specified that determining whether an award of custody to the putative father would be in the child's best interests is a central matter for concern. We find the factors comprising the best interests of the child contained in the Child Custody Act to be ones which the Legislature, case law and common sense would indicate ought likewise to be relevant in cases arising under § 39(1) of the Adoption Code. Accordingly, we find that the trial court properly looked to § 3 of the custody act for guidance in evaluating the best interests of the child in the case at bar.
Since, however, cases arising under § 39(1) of the Adoption Code may arise, as does this one, not in the context of two known disputing parties, application of the best interest test to these cases will differ from evaluation of the enumerated factors in the context of a typical dispute arising under the Child Custody Act.
The probate court found that as to a number of factors, an award of custody to appellant would serve the child's best interests as well as the available alternatives.[17] Appellee does not dispute these findings and we therefore find it unnecessary to review them.
With respect to two factors, consideration of *237 which is intended to give weight to the desirability of maintaining the continuity of a stable environment, repeatedly recognized by leading authorities and case law as important to the well-being of a child,[18] the court below found that it would not be in the child's best interest to award custody to appellant. More specifically, as mentioned supra, it was found that the child had become emotionally bonded to his foster parents but that no viable family relationship had been established between appellant and the child and that it would be better for the child to be adopted by his foster parents.
A finding that it would not be in the best interests of the child to award custody to his natural father based on these considerations can find no support on this record.
As mentioned, there is no evidence that the child's foster family would be its ultimate custodial one.
Concerning the problem of emotional bonds, on the record before it, the court was undoubtedly justified in finding that strong emotional ties had not been developed between the child and his father. Indeed, we might expect that the most *238 common case arising under subdivision 1 of § 39 will be one in which the putative father has not been able to cultivate strong emotional ties with his child. In the case at bar, for example, the child was turned over by the mother, one day after his birth, to an agency for foster care, pending the outcome of these proceedings. Appellant has been able to visit the child at the agency offices weekly but has, unsurprisingly, not been able to cultivate strong emotional bonds on the child's part. Appellant does have, however, the love and affection a natural father has for his child. He has sought, from the time he became aware of the child's conception, to gain custody of his child.
It is urged by amicus curiae, Child and Family Services of Michigan, Inc., that although the record is void of specific testimony regarding the foster parents, the foster home provides a stable and satisfactory environment. We cannot disagree. The testimony of the director of the agency indicates, however, that at the time of the hearing there was a near certainty that the child would soon be transferred to a different home[19] if the father's rights were terminated.
In sum, there is no evidence to support the trial court's findings that an award of custody to appellant would be any more disruptive to the child's life than the available alternatives.
The lower court found finally that appellant showed no inclination to raise the child in his religion. The mother of the child is Roman Catholic and the child was baptized in that faith.
Inclusion of religious considerations in a best interests test may serve two purposes. For older children who unfortunately become the subjects of custody disputes, consideration of a party's inclination *239 to raise a child in the child's religion serves to assure the continuity we have spoken of, providing, of course, the child is receiving some religious training or at least has some religious preference or affiliation. In the case of all children, including younger ones, consideration of religious factors serves to promote values highly prized in our society. We do not, however, believe that a mother's preference that an infant child be raised in the mother's own faith should be given controlling weight in deciding whether to terminate the natural father's parental rights, all other things being equal.
For all of the foregoing reasons, the lower court's conclusion that it would not be in the best interests of the child to award custody to appellant is not, therefore, supported by the record.
IV
In light of the foregoing, we find it unnecessary to reach appellant's remaining contentions.
The order of the probate court terminating appellant's parental rights is vacated. The case is remanded to the probate court for further proceedings not inconsistent with this opinion.
No costs.
KAVANAGH, C.J., and WILLIAMS, LEVIN, COLEMAN, FITZGERALD, and BLAIR MOODY, JR., JJ., concurred with RYAN, J.
NOTES
[1] MCLA 710.36; MSA 27.3178(555.36).
[2] Section 39 of the Adoption Code provides in part:

"(1) If the putative father is one who has not established any custodial relationship with the child or who did not provide any support or care for the mother during pregnancy or for either mother or child after the child's birth until notice of the hearing was served upon him, and if the putative father appears at the hearing and requests custody of the child, the court shall inquire into his fitness and his ability to properly care for the child and shall determine whether the best interests of the child will be served by granting custody to him. If the court finds that it would not be in the best interests of the child to grant custody to the putative father, the court shall terminate his rights to the child.
"(2) If the putative father is one who has established a custodial relationship with the child or has provided support or care for the mother during pregnancy or for either mother or child after the child's birth during the 90 days before notice of the hearing was served upon him, the rights of the putative father shall not be terminated except by proceedings in accordance with section 2 of chapter 12a."
The case at bar is governed by subdivision (1) of § 39. See the discussion infra.
[3] MCLA 710.65; MSA 27.3178(555.65).
[4] In re Mark T, supra; Sovereign v Sovereign, 354 Mich 65; 92 NW2d 585 (1958).
[5] Brewer v Blougher, 39 US (14 Pet) 178; 10 L Ed 408 (1840).
[6] Rights of illegitimate children and their parents in matters beyond custody have continued to evolve. In Michigan, for example, an illegitimate child has a right to support from his parents and his father's estate, MCLA 722.712; MSA 25.492; to inherit from his mother as if legitimate, MCLA 702.81; MSA 27.3178(151); and to inherit as if legitimate from his father following intermarriage of his parents or acknowledgement. MCLA 702.83; MSA 27.3178(153).

Illegitimate children as a class enjoy equal protection of the laws under a standard of judicial review which, although not of strictest scrutiny, "is not a toothless one". Trimble v Gordon, 430 US 762, 767; 97 S Ct 1459; 52 L Ed 2d 31 (1977).
The interest of a putative father in his illegitimate child is one protected by due process of law. Stanley v Illinois, 405 US 645; 92 S Ct 1208; 31 L Ed 2d 551 (1972).
[7] In re Ernst, 373 Mich 337; 129 NW2d 430 (1964); Sawyer v Sawyer, 312 Mich 524; 20 NW2d 295 (1945); Corrie v Corrie, 42 Mich 509; 4 NW 213 (1880).
[8] The Adoption Code incorporates the decision in Stanley v Illinois, supra.
[9] We agree with Justice LEVIN who wrote in In re Mark T:

"Although the proposed living arrangement described by Mr. S would not have the organization one would expect in a home where there is both a mother and a father, as it would be necessary to hire housekeepers and to rely on family members for daytime supervision, this is not much different than the arrangement which prevails in many households where the mother works, is deceased, incapacitated or the parents are separated or divorced and custody has been awarded to the father. A home is not rendered unsuitable merely because there is not a permanent mother or, for that matter, father figure in residence throughout the day." (Citations omitted.) 8 Mich App 122, 150-151.
[10] MCLA 710.31; MSA 27.3178(555.31).
[11] Id.
[12] It was testified that the child would in all probability not be placed for adoption in his then current foster home, but would rather be moved to some other situation not yet chosen at the time of the hearing.
[13] See In re Mark T, supra.
[14] In In re Weldon, supra, Justice COLEMAN made the following observations concerning the fitness-best interests controversy which are relevant to our discussion:

"The argument most frequently used for the `fitness' test is that such a consideration might result in a comparison of wealth, the respective luxury of homes and, in short, become solely a contest of economics. Indeed, this would become a tragedy for it is common knowledge that some wealthy homes are not healthy homes for children and would not serve their best interests.
"It is an effective technique to argue extremes, so the opposite position could be, for example, that third-party custody could turn upon the fact that the parent lives in a home without plumbing.
"The answer to both extremes is that neither condition in itself would be determinative. Many well-balanced, successful people have come from both financially rich and poor homes. Neither condition would be a core factor.
"The argument of comparative wealth sidetracks the real issue and even has the `red herring' effect of diverting attention from the most important factors to be considered." 397 Mich 225, 266.
[15] Section 3 of the Child Custody Act provides:

"`Best interests of the child' means the sum total of the following factors to be considered, evaluated and determined by the court:
"(a) The love, affection and other emotional ties existing between the competing parties and the child.
"(b) The capacity and disposition of competing parties to give the child love, affection and guidance and continuation of the educating and raising of the child in its religion or creed, if any.
"(c) The capacity and disposition of competing parties to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.
"(d) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.
"(e) The permanence, as a family unit, of the existing or proposed custodial home.
"(f) The moral fitness of the competing parties.
"(g) The mental and physical health of the competing parties.
"(h) The home, school and community record of the child.
"(i) The reasonable preference of the child, if the court deems the child to be of sufficient age to express preference.
"(j) Any other factor considered by the court to be relevant to a particular child custody dispute."
[16] In re Weldon, supra; opinion of COLEMAN, J., 397 Mich 225, 264; opinion of LEVIN, J., 397 Mich 225, 326-327.
[17] The court found the alternatives offered for placement of the child would equally well serve the child's needs for love, affection and guidance (§ 3[b] of the custody act); food, clothing and medical care (§ 3[c]); permanence in the custodial home (§ 3[e]); and moral fitness and mental and physical health in the custodial parties (§ 3, subds [f], [g]).
[18] In In re Weldon, supra, Justice COLEMAN quoted the following from Henry H. Foster, Jr., Adoption and Child Custody: Best Interests of the Child?, 22 Buff L Rev 1, 12-13 (1972):

"Although the article speaks to revocation of adoption consent, the following is pertinent:
"`Recent decisions in other states indicate an increasing acceptance of generally recognized theories of child development. It has been recognized that the psychological parent-child relationship is more important than biological parenthood and that true mother love entails the care and nurture of a child, rather than an empty sentiment. Ordinarily, the best psychological interests of a child require continuity and consistency in the parent-child relationship. Removing a child from the warmth and security of the place he knows as home should be done only in the most compelling circumstances.'"
See, also, Note: Alternatives to "Parental Right" in Child Custody Disputes Involving Third Parties, supra.
[19] See footnote 12.