*In re* LANG

Docket No. 214175. Submitted March 10, 1999, at Grand Rapids. Decided
June 8, 1999, at 9:10 A.M.

Carrie M. and Robert J. Scarcliff filed a petition in the Family Division
of the Midland Circuit Court, seeking to adopt James R. Lang, a
minor born out of wedlock to their now deceased daughter, Beth
Scarcliff, and James B. Lang, who was convicted and imprisoned
for manslaughter in connection with Beth Scarcliff's death. The
court, Donna T. Morris, J., terminated the parental rights of James
Lang in the minor and granted the petition for adoption. James
Lang appealed.

The Court of Appeals *held*:

1. The trial court, in terminating the respondent father's parental
rights correctly proceeded under MCL 710.39(1); MSA
27.3178(555.39)(1) instead of MCL 710.39(2); MSA
27.3178(555.39)(2). Subsection 39(2) applies where the child's
father has established a custodial relationship with the child or has
provided support or care to the child. A custodial relationship is
one in which the father exercises control and supervision over the
child and responsibility for the child's upbringing. Such a relation-
ship requires more than mere contact between the father and the
child. In this case, the respondent father did not have a custodial
relationship with the child and did not provide support or care for
the child.

2. An "incarcerated parent" exception to § 39 does not exist. Sec-
tion 39 applies to the respondent father despite the fact that his
lengthy incarceration affected his ability to maintain a custodial
relationship with the child or to provide support or care to the
child.

Affirmed.

1. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — PUTATIVE
FATHERS — CUSTODIAL RELATIONSHIP.

The parental rights of a putative father in a child with whom the
father has established a custodial relationship shall not be termi-
nated except by proceedings in accordance with MCL 710.51(6);
MSA 27.3178(555.51)(6) or MCL 712A.2; MSA 27.3178(598.2); the
parental rights of a putative father in a child with whom the father

has not established a custodial relationship, or for whom the father has not provided support, may be terminated in accordance with MCL 710.39(1); MSA 27A.3178(555.39)(1) upon an examination of the father's fitness and ability to properly care for the child and a finding that termination is in the best interests of the child; a custodial relationship is one in which the father exercises control and supervision over the child and responsibility for the child's upbringing (MCL 710.39[2]; MSA 27.3178[555.39][2]).

2. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — INCARCERATED PARENTS.

There is no incarcerated parent exception to § 39 of the Adoption Code (MCL 710.39; MSA 27.3178[555.39]).

*Charlotte L. Allen*, for the petitioners.

*Karen E. Flores*, for the respondent.

Before: GAGE, P.J., and WHITE and MARKEY, JJ.

PER CURIAM. Respondent appeals by right from an order of the Family Division of the Midland Circuit Court terminating his parental rights and granting a petition for adoption pursuant to § 39 of the Adoption Code, MCL 710.39; MSA 27.3178(555.39). We affirm.

I

On October 1, 1985, Beth Scarcliff, petitioners' daughter, gave birth to a son, James Robert Lang, who was fathered by respondent, her live-in boyfriend. On March 22, 1987, respondent shot and killed Beth. He was subsequently convicted and imprisoned for the crime.[1] On the date that his mother was killed,

---

[1] Defendant was convicted in 1990 of voluntary manslaughter and possession of a firearm during the commission of a felony in connection with the death. This Court reversed the conviction in September 1993. Defendant was retried before a different judge and convicted again. He was sentenced on July 28, 1994, to terms of nine to fifteen years and two years, respectively. This Court affirmed. *People v Lang*, unpublished opinion per

James went to live with petitioners, his maternal grandparents, and has lived with them continuously since then. Petitioners became James' guardians, and in May 1998 filed a petition to adopt James. A hearing was held on the petition on June 29, 1998.

During the hearing, petitioner Carrie Scarcliff testified that James had just finished sixth grade and had earned all A's and B's and a variety of academic and athletic awards. She testified that respondent maintained contact with James from 1990 to 1994, but respondent had not sent any cards, letters, or financial support since October 1994, when he sent James a $25 check for his birthday.[2] She further testified that there had been no telephone calls from respondent. Petitioner testified that nothing had been done to prevent contact by respondent with James. Carrie Scarcliff admitted that in 1991 she advised respondent that James had said he did not want to talk with respondent or to correspond with him at that time, but she testified that she never told respondent that his calls or letters were unwelcome. Scarcliff stated that her family remained in contact with respondent's parents until his mother died. She identified a May 1998 letter from respondent's mother asking the Scarcliffs to adopt James.

Respondent testified that he did not want petitioners to adopt James because he loved him, he tried to be a good father, and he hoped to rebuild their rela-

curiam of the Court of Appeals, issued November 1, 1996 (Docket No. 179520).

[2] Carrie Scarcliff stated that the family moved to a new home in August 1994. She testified that she sent respondent their new mailing address and, because telephone service had not yet been established, told him their telephone number would be listed in the book.

tionship upon his release from prison.[3] He asserted that he did everything he could do to stay in contact with James but that petitioners blocked communication between him and James because they hated him for killing their daughter. He testified that he had sent James three letters since October 1994 and got no response, with the last letter being sent in November or December 1994. Respondent stated his belief that petitioners should have made a conscious effort to talk to James to encourage him to write to respondent in prison. He explained that he had not tried to call James since October 1994 because petitioners moved and had told him that they would get in contact with him. He admitted that his relatives had petitioners' telephone number, but he did not ask them for it. Respondent testified that he earned $11 a month in prison but, after purchasing personal items, had nothing left to send for James' support. However, he stated that the birthday check he sent James in 1994 was money that he had saved. Respondent admitted that he had a criminal history dating back to when he was fourteen and had prior convictions of assault with intent to commit great bodily harm, malicious destruction of property, joyriding, and disorderly conduct.

The judge spoke to James in chambers and off the record. The court issued an opinion from the bench that termination of respondent's parental rights was in the best interests of the minor child.[4] Although the statutory basis for the termination was not cited, the court apparently terminated respondent's parental

---

[3] Respondent testified in the proceedings held below that his earliest possible parole date is May 2000.

[4] See MCL 710.22(f); MSA 27.3178(555.22)(f).

rights under subsection 39(1) of the Adoption Code. Petitioner Carrie Scarcliff executed a form releasing her rights as guardian and consenting to the adoption of James. The court then entered an order terminating respondent's parental rights[5] and placed James with petitioners.

II

If a child is born out of wedlock and the biological father does not voluntarily release his parental rights or consent to adoption, the child may not be placed for adoption until the father's parental rights are terminated by the court as provided in § 37[6] or § 39 of the Adoption Code or as provided under chapter XIIA of the Juvenile Code. MCL 710.31(1); MSA 27.3178(555.31)(1). At the time of the instant proceedings and entry of the court's order terminating respondent's parental rights, § 39 provided, in relevant part:

> (1) If the putative father does not come within the provisions of subsection (2), and if the putative father appears at the hearing and requests custody of the child, the court shall inquire into his fitness and his ability to properly care for the child and shall determine whether the best interests of the child will be served by granting custody to him. If the court finds that it would not be in the best interests of the

---

[5] The court used the wrong form for terminating respondent's rights. It used the form for termination "after release or consent," apparently confusing petitioner's consent to the adoption with the father's. We note, however, that the court's error in this regard is harmless and does not affect the validity of the termination of respondent's parental rights.

[6] Section 37 is not applicable in this case. It applies in general when the putative father denies interest in custody of the child, denies paternity, or cannot be identified or located. MCL 710.37; MSA 27.3178(555.37).

child to grant custody to the putative father, the court shall terminate his rights to the child.

(2) If the putative father *has established a custodial relationship* with the child or has provided support or care for the mother during pregnancy or for either mother or child after the child's birth during the 90 days before notice of the hearing was served upon him, the rights of the putative father shall not be terminated except by proceedings in accordance with section 51(6)[7] of [the Adoption Code] or section 2 of chapter XIIA [the neglect provisions of the Juvenile Code]. [MCL 710.39; MSA 27.3178(555.39) (emphasis added).][8]

The above provisions create two categories of putative fathers: those who have a custodial relationship with, or provide support for, their child and those who do not. *In re Barlow*, 404 Mich 216, 229; 273 NW2d 35 (1978). Pursuant to subsection 39(2), the parental rights of the former can be terminated only under § 51(6) of the Adoption Code or chapter XIIA of the Juvenile Code, while pursuant to subsection 39(1), those of the latter may be terminated upon an examination of the father's fitness and ability to prop-

---

[7] Subsection 51(6) is not applicable in this case. It applies when the parent having legal custody of the child remarries and that parent's spouse petitions to adopt the child. MCL 710.51(6); MSA 27.3178(555.51)(6).

[8] After the instant proceedings, subsection 2 of MCL 710.39; MSA 27.3178 (555.39) was amended pursuant to 1998 PA 94, effective September 1, 1998, to state:

If the putative father has established a custodial relationship with the child or has provided *substantial and regular* support or care *in accordance with the putative father's ability to provide such support or care* for the mother during pregnancy or for either mother or child after the child's birth during the 90 days before notice of the hearing was served upon him, the rights of the putative father shall not be terminated except by proceedings in accordance with section 51(6) of this chapter or section 2 of chapter X11A. [Emphasis indicates changes made by the amendment.]

erly care for the child and a finding that termination is in the child's best interests.

Respondent claims that the family court erroneously applied subsection 39(1) in determining whether respondent's parental rights should be terminated. Respondent, however, admits that he did not provide monetary support for his son; consequently, subsection 39(2) would apply only if he had established a custodial relationship with his son. Respondent argues that subsection 39(2) was applicable because respondent *tried* to maintain a custodial relationship with his son, but petitioners thwarted him.

We note that respondent did not assert below that subsection 39(2), rather than subsection 39(1), of the Adoption Code was applicable in this case, and the court did not address this question. Therefore, this issue is not preserved for our review. *McCready v Hoffius*, 222 Mich App 210, 218; 564 NW2d 493 (1997), rev'd on other grounds 459 Mich 131; 586 NW2d 723 (1999). However, because the issue is one of law, this Court may address it if all the necessary facts are before the Court. *Poch v Anderson*, 229 Mich App 40, 52; 580 NW2d 456 (1998). On our review of the record in this case, we disagree with respondent's claim that the family court should have applied subsection 39(2) in determining whether to terminate his respondent's parental rights. We conclude that the court correctly proceeded under subsection 39(1) of the Adoption Code and did not err in terminating respondent's parental rights under that statutory provision.

The statute does not define the term "custodial relationship," and this Court has not had occasion to consider what constitutes a custodial relationship

within the meaning of subsection 39(2) of the Adoption Code.

The interpretation of a statute is a question of law that we review de novo on appeal. *In re Dawson,* 232 Mich App 690, 696; 591 NW2d 433 (1998). The primary goal of judicial interpretation of a statute is to ascertain and give effect to the intent of the Legislature. *Id.* The first criterion in determining intent is the specific language of the statute. *Id.* In construing a phrase, a court is to use common sense and apply a reasonable construction that best accomplishes the purpose of the statute. *In re Gaipa,* 219 Mich App 80, 84; 555 NW2d 867 (1996). The fair and natural import of the terms employed, in view of the subject matter of the law, should govern, and dictionary definitions may be consulted. *In re Wirsing,* 456 Mich 467, 474; 573 NW2d 51 (1998); *Popma v Auto Club Ins Ass'n,* 446 Mich 460, 470; 521 NW2d 831 (1994). In enacting the Adoption Code, the Legislature sought, inter alia, to establish procedures to safeguard and promote the best interests of the adoptee and to provide for speedy resolution of disputes concerning a putative father's rights where placement of a child for adoption is sought. MCL 710.21a; MSA 27.3178(555.21a); *In re Barlow, supra* at 228-229. Because the Adoption Code is in derogation of the common law, its provisions are narrowly construed. *In re Dawson, supra* at 696.

*Random House Webster's College Dictionary* (1992) defines custodial as "of or pertaining to custody" and "providing protective supervision and guardianship rather than seeking to improve or cure: *custodial care.*" (Emphasis in original.) It defines custody as "keeping; guardianship; care" and as "the right of

determining the residence, care, schooling, etc., of a child or children." *Id.* Thus, a custodial relationship between a parent and child is one in which the parent exercises control and supervision over the child and responsibility for the child's upbringing. Such a relationship requires much more than mere contact between the parent and the child.

In *In re Gaipa, supra,* a panel of this Court determined what constitutes "support or care" for a putative father to come within the provisions of subsection 39(2). Although addressed primarily to that question, we find that the following comments of the Court are equally applicable to the question of what constitutes a "custodial relationship" within the purview of subsection 39(2).

> As indicated by the Supreme Court in *Barlow, supra,* the group of putative fathers that comes within the provisions of § 39(2) do so because they have established some sort of custodial or support relationship with the child or mother. It seems clear that, in demanding such *an established relationship,* the Legislature must have intended *more than an incidental, fleeting, or inconsequential offer of* support or *care* and therefore must have intended more than "any" contribution by the putative father. [*In re Gaipa, supra* at 85 (emphasis added).]

The Child Custody Act also provides guidance in construing the meaning of "custodial relationship" because both statutes share a common purpose of promoting the best interests of the child. MCL 710.21a(b); MSA 27.3178(555.21a)(b), MCL 722.26(1); MSA 25.312(6)(1), MCL 722.27(1); MSA 25.312(7)(1). See *In re Barlow, supra* at 236. Analogously, a court, in deciding a custody question in a divorce case, first determines whether an established custodial environ-

ment exists before it determines the child's best interests. *Overall v Overall*, 203 Mich App 450, 455; 512 NW2d 851 (1994). A custodial environment is established if "over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort." MCL 722.27(1)(c); MSA 25.312(7)(1)(c). Thus, a custodial relationship, as does a custodial environment, suggests that an established relationship exists between the parent and the child in which the parent exercises responsibility for the care, supervision, and upbringing of the child.[9]

Although respondent contends that the factors relevant to determining whether the putative father has provided support or care are equally applicable to determining whether he has a custodial relationship, he has not cited any authority in support of that contention and thus has waived this on appeal. *In re Contempt of Barnett*, 233 Mich App 188, 191; 592 NW2d 431 (1998). In any event, if the factors for determining whether the father has provided support or care[10] could be used to establish whether he has a custodial relationship, it would effectively eliminate any distinction between the phrases "established a custodial relationship" and "provided support or care," which is contrary to the general rules of statu-

___

[9] We do not imply that the standard for determining whether a father has established a custodial relationship under subsection 39(2) is the same as the standard for determining whether an established custodial environment exists under the Child Custody Act. The concepts are analogous, however.

[10] These include "the father's ability to provide support or care, the needs of the mother, the kind of support or care provided, the duration of the support, whether the mother impeded the father's efforts to provide her with support, and any other factors that might be significant under the facts of the case." *In re Gaipa, supra* at 86.

tory construction. *Gibson v Neelis*, 227 Mich App 187, 193; 575 NW2d 313 (1997).

Given that respondent had been in prison for approximately eight years before the hearing in this matter, that respondent had not even made an attempt to contact James for approximately four years before the hearing, and that respondent did not participate in the care and upbringing of James, it cannot be said that respondent had a custodial relationship with James. Respondent's attempts to establish a relationship with James were incidental and fleeting at best, and thus were insufficient to establish a custodial relationship. *In re Gaipa, supra.*

Because respondent did not have a custodial relationship with James and did not provide support or care for him, subsection 39(2) was inapplicable and the family court properly considered whether respondent's parental rights should be terminated under subsection 39(1). The court did not clearly err in finding that termination of respondent's parental rights was warranted under that section of the Adoption Code.

III

Respondent alternatively argues that subsection 39 should not apply at all because his lengthy incarceration effectively prohibited him from maintaining a custodial relationship or providing support or care. We disagree.

Addressing a similar argument with respect to termination under MCL 710.51(6); MSA 27.3178(555.51)(6), this Court determined that under the clear language of the statute,

no incarcerated parent exception exists. Moreover, . . . an incarcerated parent may still retain the ability to comply with the support and contact requirements of the statute. Accordingly, the statute applies to respondent. [*In re Caldwell*, 228 Mich App 116, 121; 576 NW2d 724 (1998).]

Section 39 likewise does not contain an incarcerated parent exception. See *In re Ballard*, 219 Mich App 329, 336-337; 556 NW2d 196 (1996). While incarceration effectively prohibits a parent from establishing a custodial relationship with his child, it does not necessarily preclude him from providing support for the child. The regular provision of support payments within the parent's means could establish the provision of support or care required under subsection 39(2). *In re Gaipa, supra* at 86. See *In re Caldwell, supra* at 122-123. It is undisputed that respondent did not provide any support for his minor child for a period of almost four years preceding the hearing, despite the fact that he did earn some, albeit modest, income in prison. Likewise, despite his incarceration, defendant was not prohibited from attempting to contact the child.

We affirm.