*In re* BKD

Docket No. 226679. Submitted May 17, 2001, at Detroit. Decided May 29, 2001, at 9:00 A.M.

KMD filed a petition in the Family Division of the St. Clair Circuit Court to determine whether FS was the father of BKD and, if FS was found to be the father of BKD, to determine whether FS' parental rights should be terminated. KMD and FS had an intimate relationship, and KMD became pregnant. When informed that he was the father of the unborn child, FS was skeptical because his medical history indicated that it was unlikely that he could father a child. FS did not provide financial support to KMD during the course of the pregnancy and paid for none of the medical expenses associated with the pregnancy. When informed that KMD had made plans for a private adoption of the child, FS decided that he wanted to take custody of the child if genetic testing proved that he was the father. Two days after the birth, BKD was placed with the prospective adoptive parents. FS never saw the child and did not contribute to the support of the mother or the child. When FS refused to relinquish his parental rights and continued to maintain an interest in custody if he was the biological father, the petition to terminate his rights was filed. The court, Elwood L. Brown, J., following an evidentiary hearing, found that FS was the father of the child, held that FS had not established a custodial or supportive relationship with the child within the meaning of MCL 710.39(2) and that the parental rights of FS must be terminated unless it was in the best interests of the child to grant custody to FS, found after considering the factors in MCL 710.22(f) that placement of the child with FS was not in the best interests of the child, and terminated the parental rights of FS. FS appealed.

The Court of Appeals *held*:

1. The trial court did not clearly err in holding that the granting of custody of the child to FS was not in the child's best interests after consideration of the statutory best interests factors of MCL 710.22(f). The court found that because the child was placed for adoption immediately after birth, no bond formed between respondent and the child. The court further found that FS' history of failed short-term marriages, short-term conjugal relationships, and

erratic employment, when coupled with testimony concerning FS' grossly insensitive behavior toward KMD's son with special needs, called into question FS' ability to give the child love, affection, and guidance and to provide permanence and stability. The failure of the court to address the question of FS' moral fitness was harmless. Although there was evidence presented concerning the good relationships FS had with his mother, sister, stepchildren, nephews, and nieces, given the totality of the evidence, the court did not clearly err in concluding that placement of the child with FS was not in the child's best interests.

2. FS' assertion that his constitutional rights under the Due Process and Equal Protection Clauses of the state and federal constitutions were violated because the classification scheme of MCL 710.39 uses a less rigorous test to determine whether the parental rights of a putative father are to be terminated if the putative father has failed to establish a custodial or supportive relationship and yet makes no accommodations for fathers who were deprived of an opportunity to establish a custodial or supportive relationship is without merit. The fact that the child was placed with an adoptive family immediately after birth did not make it impossible for FS to satisfy the requirements of MCL 710.39(2), because the support requirement of that subsection can be satisfied by providing support or care of the mother during the pregnancy or of either the mother or the child after the child's birth. Even if the adoption placement denied FS the ability to see the child, he could have protected his rights under MCL 710.39(2) by supporting the mother during the pregnancy or the mother or the child after the child's birth. Because there is no evidence on the record to suggest that FS made any offer to support KMD during her pregnancy or that KMD refused any such offer of support, the record does not support FS' assertion that he was denied the opportunity to satisfy the support requirement of MCL 710.39(2). The fact that FS may have refused to offer support of either the mother or the child because of his doubts concerning his paternity of the child does not excuse him from the support requirement of MCL 710.39(2) or exempt him from the consequences of failing to support the mother or the child. The classification scheme of MCL 710.39 is not constitutionally infirm.                                        '

Affirmed.

PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — ADOPTION CODE — EQUAL PROTECTION — DUE PROCESS.

The immediate placement of a child with prospective adoptive parents does not deny a putative father the ability to satisfy the support requirement of subsection 2 of § 39 of the Adoption Code so

as to render that subsection constitutionally infirm; the support requirement can be satisfied by the support of the mother during the pregnancy or by the support of the mother or the child after the child's birth (MCL 710.39[2]).

*Frederick F. Swegles,* for the petitioner.

*Heyboer & Floyd* (by *David R. Heyboer*), for the respondent.

Before: K. F. KELLY, P.J., and O'CONNELL and COOPER, JJ.

PER CURIAM. Respondent appeals as of right from an order terminating his parental rights to his minor child pursuant to MCL 710.39. We affirm.

Respondent and petitioner had an intimate relationship during the summer of 1998. After they ended their relationship in September of that year, petitioner discovered that she was pregnant and informed respondent that he was the father of her child. Respondent was skeptical because of his medical history, which indicated that it was unlikely he could father a child. Respondent has been married four times and had no children of his own during any of the marriages. Respondent and petitioner made some efforts to reunite, but they drifted apart again without coming to an agreement concerning how to plan for petitioner's child. Respondent did not offer petitioner any financial support during her pregnancy, although he did pay her for performing some household services for him.

Petitioner contacted Catholic Social Services and made plans for a private adoption. However, respondent decided that he wanted to take custody of the child if genetic testing proved that he was the father. The child was born on May 25, 1999, and placed with

the prospective adoptive parents on May 27, 1999. Respondent never saw the child and never offered to help support the child. Still, he refused to relinquish his parental rights and continued to maintain an interest in custody if he was the biological father. Although the trial court ordered respondent to take the genetic test in August 1999, respondent did not do so until February 2000, purportedly because he was unable to pay for the test.

At a hearing to determine respondent's parental rights, the trial court determined that respondent had not established a custodial or supportive relationship with the child as provided by subsection 39(2) of the Adoption Code. MCL 710.39(2). The trial court proceeded to conduct a hearing pursuant to MCL 710.22(f) to determine if placement with respondent was in the child's best interests. After considering the relevant factors, the court found that placement with respondent was not in the child's best interests and terminated respondent's parental rights. Respondent now appeals.

Respondent contends that the trial court erred in finding that custody with him was not in the child's best interests. A trial court's findings of fact are reviewed by this Court for clear error. *In re RFF*, 242 Mich App 188, 201; 617 NW2d 745 (2000). A finding is clearly erroneous if this Court is left with a definite and firm conviction that the trial court made a mistake. *Id.* at 203. We find no clear error.

Respondent's parental rights were terminated pursuant to the Adoption Code, MCL 710.21 *et seq.* When the parents of a child are unmarried and the mother places the child for adoption, the putative father's parental rights are determined under § 39 of the

Adoption Code. This section classifies putative fathers into two groups, each having a different level of legal protection for their parental rights. MCL 710.39 provides, in pertinent part:

(1) If the putative father does not come within the provisions of subsection (2), and if the putative father appears at the hearing and requests custody of the child, the court shall inquire into his fitness and his ability to properly care for the child and shall determine whether the best interests of the child will be served by granting custody to him. If the court finds that it would not be in the best interests of the child to grant custody to the putative father, the court shall terminate his rights to the child.

(2) If the putative father has established a custodial relationship with the child or has provided substantial and regular support or care in accordance with the putative father's ability to provide such support or care for the mother during pregnancy or for either mother or child after the child's birth during the 90 days before notice of the hearing was served upon him, the rights of the putative father shall not be terminated except by proceedings in accordance with section 51(6) of this chapter or section 2 of chapter XIIA.

Thus, putative fathers who have "established a custodial relationship with the child," or who have "provided substantial and regular support or care," are entitled to the same legal protection of their parental rights as legal (i.e., married) fathers under the Adoption Code and fathers under the child protection provisions of MCL 712A.1 *et seq*. In contrast, fathers who have not supported their children, or otherwise established a paternal relationship, are subject to the loss of parental rights on a showing that termination is in the child's best interests. *RFF, supra* at 195-196.

Respondent does not challenge the trial court's determination that he failed to establish a supportive

or custodial relationship with the child. Instead, respondent argues that the trial court erred in its ruling that, after considering the factors set forth in subsection 22(f) of the Adoption Code, MCL 710.22(f), placement of the child with him was not in the best interests of the child. MCL 710.22(f) provides as follows:

(f) "Best interests of the adoptee" or "best interests of the child" means the sum total of the following factors to be considered, evaluated, and determined by the court to be applied to give the adoptee permanence at the earliest possible date:

(i) The love, affection, and other emotional ties existing between the adopting individual or individuals and the adoptee or, in the case of a hearing under section 39 of this chapter, the putative father and the adoptee.

(ii) The capacity and disposition of the adopting individual or individuals or, in the case of a hearing under section 39 of this chapter, the putative father to give the adoptee love, affection, and guidance, and to educate and create a milieu that fosters the religion, racial identity, and culture of the adoptee.

(iii) The capacity and disposition of the adopting individual or individuals or, in the case of a hearing under section 39 of this chapter, the putative father, to provide the adoptee with food, clothing, education, permanence, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(iv) The length of time the adoptee has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(v) The permanence as a family unit of the proposed adoptive home, or, in the case of a hearing under section 39 of this chapter, the home of the putative father.

(vi) The moral fitness of the adopting individual or individuals or, in the case of a hearing under section 39 of this chapter, the putative father.

(vii) The mental and physical health of the adopting individual or individuals or, in the case of a hearing under section 39 of this chapter, the putative father, and of the adoptee.

(viii) The home, school, and community record of the adoptee.

(ix) The reasonable preference of the adoptee, if the adoptee is 14 years of age or less and if the court considers the adoptee to be of sufficient age to express a preference.

(x) The ability of the adopting individual or individuals to adopt the adoptee's siblings.

(xi) Any other factor considered by the court to be relevant to a particular adoption proceeding, or to a putative father's request for child custody.

Respondent first contends that the trial court erred because it failed to make separate findings regarding each best-interests factor. This issue pertains to procedure, rather than the trial court's findings of fact, and thus should have been raised under a separate issue. Accordingly, appellate review of this issue is waived because respondent failed to properly present this issue in his statement of questions presented. *Greathouse v Rhodes*, 242 Mich App 221, 240; 618 NW2d 106 (2000). Regardless, respondent's reliance on *Daniels v Daniels*, 165 Mich App 726; 418 NW2d 924 (1988), which held that the trial judge must make specific findings of fact regarding each best interests factor when considering a custody petition under the Child Custody Act, MCL 722.23, is misplaced. *Daniels* dealt with the Child Custody Act and not the Adoption Code. Moreover, despite its lack of specificity, the trial court's opinion in the instant case is adequate to satisfy the articulation requirement in *Daniels*. The trial court clearly addressed best interests factors i through v. Factors vii through x did not apply in this

case, and the trial court declined to address factor xi, the "catchall" factor. Thus, the trial court's only omission was factor vi, respondent's moral fitness. However, this omission was harmless because, as the subsequent discussion indicates, factor vi could not have changed the outcome of this case. MCR 2.613(A).

Furthermore, we find no clear error in the trial court's findings on the best interests factors. There was no bond formed between respondent and his child, hence factor i does not favor respondent. The statutory language does not allow for an exception to this factor where, as here, the child was immediately placed for adoption. See *RFF*, *supra* at 201-202.

With respect to factors ii and iii, the trial court found that respondent's history of short-term marriages and erratic employment called into question his ability to give the child love, affection, guidance, permanence, and stability. Challenging the trial court's findings under both ii and iii, respondent argues that neither his history of failed marriages and short-lived conjugal relationships, nor his employment record, have any bearing on his capacity to provide love, affection, guidance, permanence, and stability for a child. He suggests that there is no reasonable connection between an inability to preserve a marriage and an inability to care for a child. He avers that his numerous job switches were due to factors beyond his control, mainly corporate sell-outs and re-organizations.

Given the totality of evidence concerning all aspects of respondent's history and lifestyle, the trial court's findings are not clearly erroneous. The trial court justifiably perceived that respondent's history consisted of more than youthful mistakes or periodic

employment disruptions. The trial court observed that respondent had continuously failed to show the sort of commitment, permanence, and stability that children require. This evidence is sufficient to support an adverse finding for respondent under factors ii and iii. Furthermore, petitioner's testimony that respondent was grossly insensitive to her own son's special needs, and the fact that he spoke of forcible treatment of the boy, added to the negative outlook regarding respondent's capacity to give his daughter love and guidance.

Respondent also contends that the trial court should have given greater weight to evidence that he has had good relationships with his stepchildren, nephews, and nieces. We disagree. This Court recognizes that the trial court, while not infallible, is in a better position to weigh evidence and evaluate a witness' credibility. *Fletcher v Fletcher*, 229 Mich App 19, 28; 581 NW2d 11 (1998). For this reason, we find no error in the trial court's apparent disregard of Jane Diehl's testimony that she believed, on the basis of a ninety-minute meeting that was held only days before the hearing, that respondent would be a committed father.

Respondent does not dispute the trial court's finding, under factor iv, that the child has had a stable home with the prospective adoptive parents since the child was two days old. However, he contends that this finding improperly compared his home to the adoptive family's home. We disagree. The court made no findings or comments regarding the comparative quality of the two homes, but merely referenced the fact that the child has lived with her adoptive parents all her life.

Factor v considers the permanence as a family unit of the putative father's home. The trial court's discussion of respondent's unstable marriages and other intimate relationships amply established the lack of permanence in respondent's home. Respondent argues that the court should have given greater consideration to respondent's close relationships with his mother and sister. However, this argument merely critiques the trial court's weighing of the significance of evidence. The trial court made no findings regarding factor vi, moral fitness, but respondent does not claim that this omission was an error.

Thus, given the totality of the evidence, the trial court did not clearly err in concluding that placement of the child with respondent was against her best interests.

Respondent next claims that § 39 of the Adoption Code violated his constitutional rights to due process and equal protection by unfairly classifying him as a father who failed to establish a custodial or supportive relationship with his child. We disagree.

Both the federal and state constitutions guarantee the right to the due process of law and equal protection under the law. US Const, Am XIV; Const 1963, art 1, § 2. Respondent claims that the Adoption Code fails to afford the requisite protection to fathers, such as himself, who would have established a custodial, financial, or personal relationship with the adoptee had it not been for circumstances beyond their control.

The United States Supreme Court has held that the father of an illegitimate child, who has taken steps to establish a custodial or supportive relationship with the child has a constitutionally protected interest in

continuing that relationship. *Caban v Mohammed*, 441 US 380; 99 S Ct 1760; 60 L Ed 2d 297 (1979); *Stanley v Illinois*, 405 US 645; 92 S Ct 1208; 31 L Ed 2d 551 (1972). Accordingly, the Due Process and Equal Protection Clauses bar the state from terminating the parental rights of the father of an illegitimate child without the same showing of unfitness that would be necessary to terminate the rights of a mother or a married father. *Caban, supra* at 392-394; *Stanley, supra* at 658. However, where the father of an illegitimate child has not taken steps to establish a custodial or supportive relationship, the state may constitutionally terminate his parental rights through procedures and standards that are less stringent than those required to terminate the parental rights of a mother or a married father. *Lehr v Robertson*, 463 US 248, 267-268; 103 S Ct 2985; 77 L Ed 2d 614 (1983); *Quilloin v Walcott*, 434 US 246, 255-256; 98 S Ct 549; 54 L Ed 2d 511 (1978).

The two-tiered standard of § 39 for terminating putative fathers' parental rights is based on the principles set forth in the United States Supreme Court cases cited above. *In re Barlow*, 404 Mich 216, 229, n 8; 273 NW2d 35 (1978). Subsection 39(1) determines the rights of putative fathers who have failed to establish a custodial or supportive relationship according to a less rigorous best interests standard. Consistent with *Stanley* and *Caban*, subsection 39(2) determines the rights of putative fathers who have established a relationship according to the more rigorous standard applied to mothers and married fathers.

Respondent acknowledges that the basic scheme is constitutionally sound, but maintains that the statute is unconstitutional because it makes no accommoda-

tions for fathers who, like himself, were deprived of an opportunity to establish a custodial or supportive relationship. Respondent's argument here is two-fold. First, he maintains that the child's immediate placement with the prospective adoptive family made it impossible for him to support her as required by subsection 39(2). However, this argument is based on a misreading of subsection 39(2). The statute speaks of the putative father who "has established a custodial relationship with the child *or* has provided substantial and regular support or care in accordance with the putative father's ability to provide such support or care *for the mother during pregnancy or for either mother or child after the child's birth . . . .*" (Emphasis added.) Thus, regular contact with the child is not, as respondent suggests, the only means of qualifying for subsection 39(2) rights. Even if a father is unable to see the child, he can still protect his rights by supporting the mother during her pregnancy or supporting the mother or the child after birth. See *In re Lang*, 236 Mich App 129; 600 NW2d 646 (1999). Respondent could have qualified under subsection 39(2) if he had provided support or care to petitioner when she was pregnant. Respondent has never argued that he made any offer of support to petitioner when she was pregnant or that petitioner refused any offer of support. Thus, the record does not support respondent's contention that he was denied the opportunity to support his child.[1]

---

[1] Respondent's argument implicitly raises the question of how the law should classify a putative father who offers sufficient support to the mother, but whose offers were refused. This is a significant question, but is not supported by the facts in this case.

Respondent further argues that he had legitimate cause to doubt his paternity and that these doubts should excuse him from not having acted sooner to establish a custodial or supportive relationship. Specifically, he maintains that his failure to admit paternity before receiving the results of paternity testing was excusable in light of his medical history of infertility. He maintains that the trial court should not have expected him to admit paternity earlier, when doing so would have entailed the risk of incurring the legal obligation to support another man's child.

Respondent's argument is predicated on the trial court's statement that respondent could have protected his rights under subsection 39(2) by admitting paternity before the child was born. However, this statement was legally erroneous because filing a claim of paternity would not have entitled respondent to rights under subsection 39(2). *In re Dawson*, 232 Mich App 690, 695; 591 NW2d 433 (1998), provides that admissions of paternity do not constitute support within the meaning of subsection 39(2).

The filing of a notice of intent to claim paternity is not "support or care" for purposes of subsection 39(2). A notice of intent to claim paternity filed pursuant to MCL 710.33(2) merely creates a rebuttable presumption of paternity for purposes of the Paternity Act and dependency or neglect proceedings under MCL 712A.1 *et seq.* Nothing in § 33 or § 39 supports a finding that the Legislature intended the filing of a notice of intent to claim paternity to constitute support or care for purposes of subsection 39(2). *Dawson, supra* at 695.

Admitting paternity does not, by itself, entitle a putative father to the protections of subsection 39(2).

Therefore, the trial court erred in stating that respondent missed an opportunity to qualify for rights under subsection 39(2) by not claiming paternity.[2] Accordingly, there was no need for respondent to admit paternity here and no statutorily created dilemma for putative fathers who doubt their paternity.

Furthermore, we are unconvinced by respondent's portrayal that his doubts concerning paternity create a unique condition that should excuse him from having to offer support to petitioner and her child. We can reasonably infer that respondent's situation is common among putative fathers who come under subsection 39(1). Therefore, it was unreasonable for respondent to assert that his presumed sterility was a special condition that prevented him from establishing a custodial or supportive relationship.

Similarly, in *In re RFF*, *supra*, this Court considered a claim that § 39 is unconstitutional because it makes no accommodation for a father whose failure to establish a supportive or custodial relationship is attributable to the mother's deception about her pregnancy and his paternity. The Court concluded that classifying the father in that case under subsection 39(1) was not a violation of the Equal Protection Clause because, despite the extenuating circumstances, the father simply did not establish a constitutionally protected father-child relationship. *In re RFF*, *supra* at 210-211. We believe that the father's circumstances in *RFF*—deception by the mother concerning his paternity—are far more compelling than respon-

---

[2] However, the trial court's error was harmless to respondent's case, because there was no evidence to otherwise support a finding that respondent's parental rights should be determined under subsection 39(2). MCR 2.613(A).

dent's subjective doubts about his paternity, yet that Court still found no constitutional violation. Accordingly, we do not believe that § 39 is constitutionally infirm for not accommodating fathers who doubt their paternity.

Affirmed.