*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* REV, Minor.

UNPUBLISHED
October 12, 2023

No. 365482
Osceola Circuit Court
Family Division
LC No. 2021-000020-AD

Before: LETICA, P.J., and HOOD and MALDONADO, JJ.

PER CURIAM.

Respondent-father appeals by right the trial court's February 24, 2023 order terminating his parental rights to the minor child, REV, pursuant to MCL 710.39(1). REV's mother, JV, voluntarily relinquished her parental rights. We affirm.

## I. BACKGROUND

## A. FIRST APPEAL

This appeal marks the second time that this case has appeared before this Court. The facts were outlined by this Court during the previous appeal:

> REV was born out of wedlock, and her mother released her parental rights to the child and consented to an adoption through interested-party Bethany Christian Services (Bethany), a licensed Michigan adoption agency. Mother petitioned the trial court for a hearing to identify respondent as REV's father and to determine or terminate his parental rights. Respondent refused to voluntarily relinquish his parental rights to REV and sought custody of the child. After numerous proceedings, including a hearing on remand from this Court, respondent's parental rights were ultimately terminated. [*In re REV*, unpublished per curiam opinion of the Court of Appeals, issued October 22, 2022 (Docket No. 360817), p 1.]

This Court reversed the trial court's order terminating respondent's parental rights. This Court concluded that the trial court erred by demanding that respondent prove that his parental rights were protected by MCL 710.39(2) instead of requiring petitioner to prove by clear and

-1-

convincing evidence that respondent's parental rights were not shielded by MCL 710.39(2). *In re REV*, unpub op at 14, 15. Second, this Court noted that there was no dispute that respondent did not have an established custodial relationship with REV. This Court concluded, however, that the trial court's analysis was incomplete because it did not consider respondent's ability to provide support or care. *Id*. at 16. This Court concluded that respondent's testimony alone did not constitute clear and convincing evidence that respondent, although having the ability to do so, failed to provide substantial and regular support or care for JV during her pregnancy or for either JV or REV after REV's birth. *Id*. This Court remanded the case to allow a supplemental hearing at which additional testimony or evidence could be presented by JV, Bethany, respondent, or any other interested party. *Id*. This Court explained:

> If the trial court determines, under the clear and convincing evidence standard, that upon consideration of the supplemental evidence, termination of respondent's parental rights is not precluded by MCL 710.39(2), the court shall move on to consider MCL 710.39(1) anew in light of the additional evidence. We do reject respondent's argument that the trial court clearly erred in its ruling under MCL 710.39(1), as based on the existing record. [*Id*. at 17.]

## B. PROCEEDINGS ON REMAND

A hearing was conducted on remand on February 24, 2023. At that time, respondent was incarcerated in prison as a result of his *nolo contendere* plea to two counts of domestic violence and/or knowingly assaulting JV while she was pregnant, third offense, and felonious assault against another individual, and of his guilty plea to a count of intimidating a witness. His earliest release date was March 16, 2023, and his maximum discharge date was January 16, 2028. Respondent testified that he was taking domestic violence and substance abuse classes in prison, but would not admit that he had a substance abuse problem. Respondent had been in jail since his arrest on October 28, 2021. REV was born on December 4, 2021.

On remand, respondent confirmed much of the testimony he had presented at a June 24, 2022 hearing. He indicated that he was not willing to consent to adoption. He conceded that he had never met REV and that he continued to want a DNA test. He testified that he had supported JV for two to four months of her pregnancy by renting a room and providing basic food and necessities until "she disappeared." Except for mentioning the cost of rent, respondent did not provide any dollar amounts, nor did he have documentary proof that he had financially assisted JV. He testified that before being jailed, he was earning about $500 per week as a roofer and that he had money coming in to support JV. Respondent, who acknowledged Bethany's subpoena, did not produce any paystubs. Respondent testified that he had no assets. He testified that he had not yet obtained a job in prison and that he had no commissary funds. He had not asked prison staff about the possibility of getting supplies to write a letter to REV because "the deputies are assholes." He never asked his mother to purchase gifts for REV.

Respondent testified that he was talking with his mother about helping him raise REV, but they were "having issues" and had not come to an agreement. Respondent's mother was 49 years of age and worked day shifts at a hospital. Respondent's plan was to move in with his mother when he was released from prison. He planned to find someone to watch REV so that he could work, or to find a work-from-home job, but he needed "more time to figure something out." He

did not know the cost of daycare. He had not talked with his mother about how to pay for daycare, but he "imagined" that his mother would help with daycare. He contended that he was aware of the needs of a young child, including a crib, food, and medical care. Respondent testified that his mother and his girlfriend each had a car seat and were trying to acquire things for REV that he would be able to use to care for her if he gained custody. He testified that he and his girlfriend were talking about getting married. He conceded, however, that neither his mother nor his girlfriend had visited him in prison.

Respondent testified about his employment history. He testified that he worked for five years at Outback Steakhouse beginning when he was 21 years of age and that he was 34 years old at the time of the hearing. Between the ages of 21 and 26 he was incarcerated for short periods of time and was able to work on work-release. Respondent testified that if he was released from prison at his earliest release date he would support REV with help from friends and family. He testified that he was fit and able to work, that he was not disabled, and that he already had work "lined up." He identified a job "climbing cell towers" but he had not been able to apply for the job because of his incarceration. The business was owned by a man who was a friend of another jail inmate. Respondent had not met the man in person but talked to him once on the phone. Respondent testified that he also had "other job offers," depending on his release date from prison. He said that the roofing business he formerly worked for was "waiting for him to get out." He said that the manager of Outback Steakhouse said that he could come back, that his former employer at Grand Traverse Outdoor wanted him back, and that his cousin had a job lined up for him at Sara Lee.

Respondent testified that JV was a drug addict but that he had "no problems" with drugs or alcohol. He admitted that he had one narcotics-related arrest when he was 32 or 33 years of age and "served time."[1]

Following respondent's testimony, JV assured the court that she had been sober for "one year, one month, and 20 days." She testified that she met respondent through a friend in March 2021. According to JV, she and respondent quickly entered into a committed relationship and were always looking for someplace to stay; they "bounced from place to place" in flop houses. Initially, and for three or four months of the five-month relationship, JV and respondent stayed in a tent in the backyard of respondent's cousin's home. When it rained and a bedroom was not available in the house, JV and respondent bounced to and from two other houses. JV would babysit, cook, and clean in exchange for their accommodations. On one occasion, the woman who lived at respondent's cousin's home threatened to "kick everyone out if they did not pay," but then "more drugs came in" and the issue was not brought up again.

JV testified that both she and respondent used drugs during the relationship. Respondent's drugs of choice were alcohol and methamphetamine, with heroin use off and on. Respondent would get drugs, sell some, and keep some for himself.

JV disagreed that respondent made $500 a week and paid rent. She testified that the couple did not contribute to living expenses at any place that they stayed, except for her doing chores and

---

[1] The trial court admitted several exhibits relating to respondent's criminal history.

babysitting. JV testified that respondent did not provide her with food and necessities, and never gave her money, a credit card, a debit card, or a gas card. Some days she did not eat. JV said that the woman who lived with respondent's cousin had a Bridge card and would buy food. JV testified that she never saw respondent with money. She could not recall ever going to a grocery store and shopping. She testified that respondent never brought home groceries, clothing, "or anything." JV had a cell phone that was provided by another individual, who also paid for the service on the phone. JV testified that respondent did not get up every day and leave for work. To JV's knowledge, respondent never had a consistent job during their relationship. JV testified that she knew where respondent was most of the time and that they were together most days using or searching for drugs.

JV testified that her relationship with respondent deteriorated toward the end of July 2021. Respondent was drunk all the time and using drugs and became emotionally, physically, and mentally abusive to her. He yelled, threw things, physically touched her, broke things, and smashed her cell phone. Physical violence occurred four times within the relationship. Respondent knew that JV was afraid of him.

Around August 15, 2021, JV discovered that she was pregnant and was certain that respondent was the father. Respondent denied that he was the father and had no interest when told that the baby was his. JV decided to leave respondent on August 18 after he pulled her by her hair. She moved into a former residence in Kingsley. Respondent knew where JV was staying, but he knew that he was not allowed on the property and kept his distance from the house. According to JV, respondent stalked her and tried to harass her through mutual acquaintances. He set the field next to the residence on fire and spray painted trees where JV and respondent used to hike. JV testified that the messages respondent sent through the mutual acquaintances grew more violent and threatened her safety.

JV testified that she did not see respondent after she moved out on August 18 until he showed up in a vehicle at the Kingsley house on October 18, 2021. Two other men were also there. JV testified that she went outside to talk to respondent while he was in the car. Respondent had a pistol that he aimed at JV when she was a few feet from him. Respondent told JV that he burned all of her belongings, including her clothing, her purse, her identification, her passport, and "everything she owned," in an outdoor fire. Respondent fired the gun while it was pointed at the ground.

JV testified that respondent did not contact her after he found out that she was pregnant to see if she needed anything. She testified that she had been to respondent's mother's home a few times and that the condition of the home inside and outside was "disgusting"; it was not an appropriate place to raise a baby. JV testified that respondent did not appear to have a good relationship with his mother and that she was "shocked" to hear respondent's testimony that his mother would help him care for REV.

The trial court issued its ruling on the record, stating that it was applying the clear and convincing evidence as directed by this Court. The court first found that there was no established custodial relationship between respondent and REV, given respondent's admission that he never met REV. The court next found that respondent had the ability to provide support. The court noted respondent's testimony that he had no disabilities and was capable of working, as well as

his testimony that he was making $500 a week working as a roofer during his relationship with JV. In light of this testimony, the court found that respondent had the ability to provide substantial and regular support or care. The court found, however, that ability and disposition are two different things, and that respondent did not provide substantial and regular support or care for JV during her pregnancy or for JV or REV during the 90 days before being served with the notice of hearing. In this regard, the court found JV's testimony credible. The court noted that JV's testimony was "very clear" that respondent did not provide her anything, and that the places JV and respondent stayed were essentially flop houses. The court also noted JV's testimony that during the day JV and respondent were on a hunt for drugs and that they used drugs together multiple times. It further noted JV's testimony that she would cook or clean to "earn her keep" when the couple was living in the backyard tent and that respondent "didn't provide anything regarding that." The court also noted JV's testimony that respondent never provided money, gas cards, or food cards; that food was provided by the woman who lived with respondent's cousin and had a Bridge card; and that on some days JV would not eat. The court found that "bouncing around from place to place" was not "normal residential placement" and that there was not any sort of rent paid other than JV doing odd jobs. The court also found that the parties' relationship ended shortly after respondent learned that JV was pregnant and that he never "asked or offered to get anything for her or the unborn baby." Because respondent requested custody, the court addressed under MCL 710.39(1) respondent's fitness and his ability to properly care for REV. After making factual findings based on the testimony and exhibits presented, the court found that respondent was not fit and that he had no ability to provide proper care and custody of REV "presently or any time in the future." The court then proceeded to examine and weigh the best-interest factors found in MCL 710.22(g) and concluded that it would not be in REV's best interests for respondent to have custody.

The court entered an order terminating respondent's parental rights, and this appeal followed.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

"To the extent that resolution of this appeal entails a question of law, we conduct review de novo." *In re TMK*, 242 Mich App 302, 304; 617 NW2d 925 (2000).

"We review a lower court's decision to grant or deny a petition for adoption for an abuse of discretion." *Id.* The trial court abuses its discretion when its decision falls outside the range of principled outcomes. *In re MKK*, 286 Mich App 549, 564; 781 NW2d 132 (2009).

"A trial court's factual findings during a proceeding to terminate parental rights under the Adoption Code are reviewed for clear error." *In re AGD*, 327 Mich App 332, 338; 933 NW2d 751 (2019). This includes a trial court's findings regarding a child's best interests pursuant to MCL 710.39(1) and MCL 710.22(g). See *In re BKD*, 246 Mich App 212, 215; 631 NW2d 353 (2001). "A finding is clearly erroneous if this Court is left with a definite and firm conviction that the trial court made a mistake." *Id.* This Court defers to the trial court's "special opportunity" to evaluate the credibility of witnesses who appear before it. MCR 2.613(C).

Finally, we review de novo questions of statutory interpretation. *In re AGD*, 327 Mich App at 338. This Court's "primary task in construing a statute, is to discern and give effect to the intent of the Legislature." *In re AGD*, 327 Mich App 332, 343; 933 NW2d 751 (2019). "The words used by the Legislature in writing a statute provide us with the most reliable evidence of the Legislature's intent." *Drew v Cass Co*, 299 Mich App 495, 499; 830 NW2d 832 (2013).

## B. DISCUSSION

Section 31 of the Michigan Adoption Code, MCL 710.21 *et seq.*, provides that, in general, "if a child is born out of wedlock and the release or consent of the biological father cannot be obtained, the child shall not be placed for adoption until the parental rights of the father are terminated . . . ." MCL 710.31(1). Section 39 provides in relevant part:

> (1) If the putative father does not come within the provisions of subsection (2), and if the putative father appears at the hearing and requests custody of the child, the court shall inquire into his fitness and his ability to properly care for the child and shall determine whether the best interests of the child will be served by granting custody to him. If the court finds that it would not be in the best interests of the child to grant custody to the putative father, the court shall terminate his rights to the child.
>
> (2) If the putative father has established a custodial relationship with the child or has provided substantial and regular support or care in accordance with the putative father's ability to provide support or care for the mother during pregnancy or for either mother or child after the child's birth during the 90 days before notice of the hearing was served upon him, the rights of the putative father shall not be terminated except by proceedings in accordance with section 51(6) of this chapter or section 2 of chapter XIIA. [MCL 710.39.]

Accordingly, a putative father may avail himself of substantially greater protections against termination of his parental rights if any provisions of MCL 710.39(2) apply. A putative father is presumed to entitled to these protections, and it is the petitioner's burden to establish by clear and convincing evidence that he is not. *In re BWJ*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 363607); slip op at 4. This Court held in respondent's previous appeal that "clear and convincing evidence warranting termination can be demonstrated without the petitioner specifically eliciting the testimony or producing the evidence. And clear and convincing evidence can be potentially established through a respondent's testimony." *In re REV*, unpub op at 14.[2] If

---

[2] While unpublished opinions of this Court generally are not binding, *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017), we are bound by this Court's pronouncements in respondent's prior appeal because such pronouncements are "the law of the case." See *Higgins Lake Prop Owners Ass'n v Gerrish Twp*, 255 Mich App 83, 91; 662 NW2d 387 (2003) ("The law of the case doctrine holds that a ruling by an appellate court on a particular issue binds the appellate court and all lower tribunals with respect to that issue.").

the putative father is not protected by Subsection (2), then whether his parental rights are to be terminated is determined by the court's assessment of the child's best interests. MCL 710.39(1).

In this case, respondent argues that the trial court erred by finding that he was not entitled to the protections of ML 710.39(2). Alternatively, respondent argues that the trial court erred by finding that it was not REV's best interests to grant custody to respondent. Both arguments are without merit.

## 1. HEIGHTENED PROTECTIONS OF MCL 710.39(2)

Respondent argues that the trial court erred by finding that respondent did not come within the protection of MCL 710.39(2) because the court's finding that he did not provide substantial and regular support or care in accordance with his ability was not supported by clear and convincing evidence. We disagree.

There are three ways that a putative father can obtain the protection of MCL 710.39(2), and the facts need only support one of them; therefore, the petitioner must prove by clear and convincing evidence that the putative father does not fall within any of these three options. See *People v Kowalski*, 489 Mich 488, 499 n 11; 803 NW2d 200 (2011) (" 'Or' is a disjunctive term, used to indicate a disunion, a separation, an alternative."). A putative father comes within the provisions of this subsection if: (1) he "has established a custodial relationship with the child"; (2) he "has provided substantial and regular support or care in accordance with [his] ability to provide support or care for the mother during pregnancy"; or (3) he "has provided substantial and regular support or care in accordance [his] ability to provide support or care . . . for either mother or child after the child's birth during the 90 days before notice of the hearing was served upon him . . . ." MCL 710.39(2).

It is undisputed that respondent does not fall within Subsection (2) pursuant to option one because he has never even met REV. However, respondent argues that petitioner failed to establish that the failed to provide care or support in accordance with his ability during JV's pregnancy or during the 90-day period before he received notice of the hearing.

### a. Respondent Did Not Support JV During Pregnancy

Respondent testified that he was not disabled and that he was capable of working. He testified that he was not a drug addict and did not have a drug problem. He testified that he was earning $500 a week and that he had "money coming in" to support JV during the pregnancy until he was jailed in late October 2021. He testified that he was providing care for JV by providing food, necessities, and housing. Respondent's testimony provided clear and convincing evidence that respondent had the ability to work and the *ability* to provide care or support for nearly eight months of JV's pregnancy.

JV's testimony was markedly different from respondent's, and the court found JV credible. JV apparently became pregnant during March 2021, the first month of the parties' relationship. She testified that, during the relationship, the parties "bounced from place to place" in flop houses and for three or four months they lived primarily in a tent in respondent's cousin's backyard. She testified that she would babysit, clean, and cook in exchange for staying overnight in the tent and using the shower and bathroom and that no rent was paid for any of the places where the parties

stayed.  JV testified that respondent did not provide her with food, clothing, necessities, "or anything."  She testified that respondent did not give her money and did not give her a debit card, credit card, or gas card.  Some days she did not eat, and on other days she ate food that was purchased with a Bridge card by a woman who lived in respondent's cousin's home.  JV testified that after she left respondent in August 2021 respondent never contacted her to see if she needed anything.  The trial court found JV's testimony regarding respondent's failure to provide care or support credible, and the trial court was in a superior position to resolve the credibility contest.

Respondent now contends that the court's finding that JV was credible was inconsistent with its finding that respondent was able to provide any care or support.  According to respondent:

> The Court tries to reason that Appellant's testimony that he was working and had long term jobs was sufficient to make a finding that Appellant had some ability; however, the Court notes later that it is Appellee Mother who gave credible evidence that Appellant was not working and Appellant was not providing anything and never had money.  Both sets of facts cannot be true.  The Trial Court seemed to want to be able to use Appellant's words against him to support his termination, but then repeatedly says that it believed Appellee Mother's testimony, which was completely contrary.

There are multiple problems with respondent's line of reasoning.  Credibility is not a "take it or leave it" proposition; triers of fact are free to believe parts of a witness's testimony and disbelieve other parts.  More importantly, while JV's testimony suggested that respondent was not working or providing care or support before his incarceration, her testimony does not suggest that respondent did not have the *ability* to work and provide support.  At most, JV's testimony suggested that respondent *chose* not to work during their relationship.

**b.  Respondent Did Not Support JV or REV During the 90 Days Prior to Receiving Notice of the Hearing**

Respondent was jailed on October 21, 2021, and REV was born on December 4, 2021.  The service of the original petition on December 10, 2021, was defective.  *In re REV*, unpub op at 13.  Respondent was personally served with the petition on January 7, 2022.  *Id*.  Accordingly, it is undisputed that respondent was incarcerated for the entirety of the 90-day period preceding his receipt of notice of the hearing.  Respondent essentially argues that his incarceration precludes a finding that he did not come within this provision of MCL 710.39(2) because he was not earning any money while in jail and had no assets.  This Court addressed a similar argument when it decided *In re Lang*, 236 Mich App 129, 139-140; 600 NW2d 646 (1999), and it concluded that the statute "does not contain an incarcerated parent exception."

> While incarceration effectively prohibits a parent from establishing a custodial relationship with his child, it does not necessarily preclude him from providing support for the child.  The regular provision of support payments within the parent's means could establish the provision of support or care required under subsection 39(2).  It is undisputed that respondent did not provide any support for his minor child for a period of almost four years preceding the hearing, despite the fact that he did earn some, albeit modest, income in prison.

-8-

Importantly, *Lang* must be read in conjunction with the Michigan Supreme Court's conclusion in *In re Mason*, 486 Mich 142, 160; 782 NW2d 747 (2010) that incarceration alone cannot serve as the basis for terminating parental rights. When read together, we believe that *Lang* and *Mason* jointly stand for the proposition that a parent's rights cannot be terminated because they are incarcerated but that incarceration also does not serve as an impenetrable shield against termination. When MCL 710.39(2) is construed through this lens, we interpret it to mean that a parent is obligated to provide support to the extent that they are able to provide support. While the statute calls for "substantial and regular support," it qualifies this statement by saying that this substantial and regular support is "in accordance with the putative father's ability" to do so. Therefore, we conclude that the Legislature's intent was that "substantial and regular support" is to be defined relative to the putative father's ability. Accordingly, if a putative father is only able to provide a small amount of support but instead provides nothing, the putative father has failed to provide "substantial and regular support in accordance with [his] ability." This interpretation is consistent with the general rule that statutes should be construed to avoid absurd results. *SP v BEK*, 339 Mich App 171, 178; 981 NW2d 500 (2021). It would be absurd to conclude that a wholly absent and disinterested putative father is immune from termination because he does not have the ability while incarcerated to generate enough income to support a child. By interpreting the statute to mean that "substantial and regular support" should be defined with reference to the putative father's ability, which is consistent with the Legislature's usage of "in accordance with," this absurd result is avoided.

The record is relatively scant regarding respondent's means while incarcerated, but the following exchange did occur:

> *Q*. Since the last time you testified, have you sent any type of support, whatsoever, to REV?
>
> *A*. I'm sorry. Have I sent any support to her?
>
> *Q*. Right.
>
> *A*. I am unable to.
>
> *Q*. Do you get paid for doing job—a job at the prison?
>
> *A*. I've only been here two months. I haven't even got a job yet.
>
> *Q*. Do you have commissary funds?
>
> *A*. I do not.

We would certainly prefer a more detailed record regarding the availability of gainful employment during respondent's period of incarceration. However, a greater examination of the context within which this testimony was offered makes clear that respondent's total failure to support REV was the result of a lack of desire rather than a lack of means. The evidence suggested that respondent never supported REV before his incarceration, so it would be reasonable to infer that he had no intent to do so after his incarceration. Respondent testified that he never attempted to contact REV, did not know where REV lived, never asked for the tools needed to write REV a

letter, and never asked his mother to give REV any cards or presents. There was no evidence suggesting that respondent ever attempted to do anything that resembled parenting REV while he was incarcerated, so it was reasonable for the court to infer that his failure to provide any financial support was a failure of effort rather than means. Moreover, respondent insists on appeal that he has the ability to care for REV in large part due to the assistance of his mother and girlfriend. He testified that both women procured car seats that he could use if he was granted custody. Furthermore, he was working with them on getting other items for the child for when he had her in his care. However, the evidence suggests that he never elicited the assistance of anyone to offer support to the child during the 90 days preceding notice of the hearing. Simply put, while respondent was incarcerated he did have the ability to provide *some*, if not much, support to the child, but he instead did absolutely nothing. This, combined with the history of unwillingness to provide JV support while she was pregnant, gave the court ample support for its conclusion that his failure to provide substantial and regular support in accordance with his ability was a choice unrelated to his incarceration.

For these reasons, we conclude that the trial court did not err by finding that respondent did not fall within the provisions of MCL 710.39(2).

## 2. BEST INTERESTS

Because respondent was not entitled to the special protections described in MCL 710.39(2), the trial court was required to "inquire into his fitness and his ability to properly care for" REV and then "determine whether the best interests of the child will be served by granting custody to him." MCL 710.39(1). The factors to consider, evaluate, and determine when assessing the best interests of the child are listed in section 22 of the Adoption Code, which provides in relevant part:

> "Best interests of the adoptee" or "best interests of the child" means the sum total of the following factors to be considered, evaluated, and determined by the court to be applied to give the adoptee permanence at the earliest possible date:
>
> (*i*) The love, affection, and other emotional ties existing between the adopting individual or individuals and the adoptee or, in the case of a hearing under [MCL 710.39], the putative father and the adoptee.
>
> (*ii*) The capacity and disposition of the adopting individual or individuals or, in the case of a hearing under [MCL 710.39], the putative father to give the adoptee love, affection, and guidance, and to educate and create a milieu that fosters the religion, racial identity, and culture of the adoptee.
>
> (*iii*) The capacity and disposition of the adopting individual or individuals or, in the case of a hearing under [MCL 710.39], the putative father, to provide the adoptee with food, clothing, education, permanence, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.
>
> (*iv*) The length of time the adoptee has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(*v*) The permanence as a family unit of the proposed adoptive home, or, in the case of a hearing under [MCL 710.39], the home of the putative father.

(*vi*) The moral fitness of the adopting individual or individuals or, in the case of a hearing under [MCL 710.39], of the putative father.

(*vii*) The mental and physical health of the adopting individual or individuals or, in the case of a hearing under [MCL 710.39], of the putative father, and of the adoptee.

(*viii*) The home, school, and community record of the adoptee.

(*ix*) The reasonable preference of the adoptee, if the adoptee is 14 years of age or less and if the court considers the adoptee to be of sufficient age to express a preference.

(*x*) The ability and willingness of the adopting individual or individuals to adopt the adoptee's siblings.

(*xi*) Any other factor considered by the court to be relevant to a particular adoption proceeding, or to a putative father's request for child custody. [MCL 710.22(g).]

"[W]hen proceeding under MCL 710.39(1) the statute requires, *inter alia*, that the court shall determine the best interests of the child and that to do so the court will, pursuant to MCL 710.22(g)(*i*) through (*xi*), consider, evaluate, and determine the factors set forth therein." *In re BWJ*, ___ Mich App ___; slip op at 6 (quotation marks and alteration omitted).

### a. Instructions From Prior Appeal

As we already noted, this case was previously before this Court and was subsequently remanded for limited purposes. Of note, the panel affirmed the trial court's finding that, pursuant to MCL 710.39(1), custody with respondent was not in REV's best interests; however, the panel did instruct the trial court to revisit the issue if it heard new evidence on remand. See *REV*, unpub op at 17-18. This Court explained:

In light of respondent's extensive criminal record, which includes convictions for maintaining a drug house and domestic violence, his lack of real property, bank accounts, motor vehicles, or assets of any value, his acknowledgement of a current inability to support REV, and his tenuous future plan to live with and rely on his mother, *we cannot conclude that the trial court erred by finding that respondent was unfit, that he lacked the ability to properly care for REV, and that it would not be in the child's best interests to grant custody to respondent.* Contrary to respondent's argument, we opine that respondent's criminal record can indeed provide insight into what kind of a parent he would be if awarded custody. And we find unremarkable, underwhelming, and unpersuasive respondent's testimony that he was aware that a young child needs food, clothing, a crib, and medical care. *If new evidence is presented in a supplemental hearing,*

> *we direct the trial court to revisit MCL 710.39(1) and assess it anew.* [*Id*. at 18 (emphasis added).]

On remand, the trial court did hear new evidence and did revisit MCL 710.39(1). However, pursuant to the law of the case doctrine, we will, as relevant, bear in mind and afford any due respect to the comments of the prior panel as we analyze this issue. See generally *Higgins Lake Prop Owners Ass'n v Gerrish Twp*, 255 Mich App 83, 91; 662 NW2d 387 (2003).

### b.  Trial Court's Analytical Framework

At the outset, respondent argues that the trial court failed to actually apply the factors articulated by MCL 710.22(g). According to respondent:

> In this case, the Trial Court did not identify the statute relied upon in determining the best interest of this child. The Trial Court makes a blanket statement that it was not considering the adoptive home and then evaluates factors that were similar to factors set forth in MCL 710.22(g), but are not the same.

This argument is without merit. It is true that the trial court did not specifically state that it was using the factors from MCL 710.22(g) and that it did not read the factors verbatim when going through its analysis; nevertheless, it was abundantly clear that the trial court was applying the correct factors, and respondent cites no authority in support of his implicit assertion that the trial court must specifically articulate that it is relying on MCL 710.22(g) before reading the facotrs verbatim. Respondent also supports this argument with examples of three factors—(*vii*), (*viii*), and (*x*)—that he argues were improperly applied. We will discuss these arguments later during our analysis of the best interest factors.

### c.  Respondent's Parental Fitness

Respondent argues that the trial court clearly erred by finding that respondent was not fit to parent the child. He contends that the trial court erred by relying on his criminal history and his domestic violence toward JV when finding that respondent was not a fit parent because the crimes and domestic violence did not involve the child. However, this Court has already concluded, on the basis of the record as it existed at the time, that "[i]n light of respondent's extensive criminal record, which includes convictions for maintaining a drug house and domestic violence, . . . we cannot conclude that the trial court erred by finding that respondent was unfit." *REV*, unpub op at 18. This Court noted that respondent's criminal record provided insight into what kind of parent he would be if awarded custody. *Id*. Further, new evidence was presented that respondent had entered a plea of *nolo contendere* to the charges that were pending at the time of this Court's previous opinion, which included domestic violence and felonious assault charges. The trial court did not err by finding that respondent was unfit.[3]

---

[3] The trial court also found on remand that respondent did not have the ability to properly care for the child, but respondent does not challenge this finding on appeal. Nevertheless, this Court previously stated, on the basis of the record as it existed at that time, that it could not conclude that

### d. Best Interest Factors

Respondent argues that some of the trial court's findings regarding the best-interest factors were clearly erroneous but leaves others uncontested. We conclude that his arguments are without merit.

Concerning factor (*i*), which considers the love, affection, and other emotional ties existing between the child and the putative father, respondent concedes he did not have a relationship with the child. He argues, however, that he was not given the opportunity to establish a relationship with REV because REV was placed into an adoptive home at the time of birth. However, the evidence suggests that respondent never requested to see REV when he was incarcerated and that he never even attempted to write REV a letter. Moreover, respondent conceded that he never elicited the assistance of his mother, his girlfriend, or anybody else to give REV cards or presents. Therefore, this factor was correctly decided.

Concerning factor (*ii*), which considers the capacity and disposition of the putative father to give the child love, affection, and guidance and to educate the child and foster her religion, racial identity, and culture, the trial court found as follows:

> I'm going to make no findings regarding the ability to raise the child—well, the capacity to give love, affection, and guidance, I don't find that he necessarily has the capacity to do so. There's been no testimony that he has any ability to provide guidance to a minor child. . . . I guess I will presume that he can show love and affection. But that'd be the capacity only. Disposition, I'm not so certain based on the previous history and testimony from [JV] today.
>
> I don't have any testimony or issues regarding raising a child in religion or creed, so I'm not going to make any findings.

Respondent argues that it was not clear how the trial court weighed this factor but that it "appears that ultimately it erroneously concluded that [respondent] had the capacity, but not the disposition to provide food, clothing and medical care." Respondent argues that he had no obligation to support JV until she announced her pregnancy, and that JV "actively sought to keep him away after announcing her pregnancy, which gave him little opportunity to provide." Respondent's argument is not entirely clear. It's unclear how respondent's arguments actually pertain to factor (*ii*), and it seems as though these arguments were intended to be directed toward factor (*iii*), which we address later. Therefore, respondent has not established, or genuinely attempted to establish, that the trial court erred by finding that this factor did not favor respondent.

---

the trial court erred by finding that respondent lacked the ability to properly care for the child in light of respondent's "lack of real property, bank accounts, motor vehicles, or assets of any value, his lack of a current inability to support REV, and his tenuous future plan to live with and rely on his mother." These facts remained the same at the time of remand. Further, new evidence was presented that respondent had been sentenced for the criminal offenses that were pending at the time of this Court's previous decision.

Factor (*iii*) concerns the capacity or disposition of the putative father to provide the child with food, clothing, education, permanence, and medical care. Concerning this factor, the trial court found:

> Capacity and disposition to provide the child food, clothing, medical care, or other care. He has the capacity to do so because he has the ability to work. He has nothing to keep him from working. Disposition, however, based on disposition to provide for [JV], as we've already discussed, he has none. So, that's not in his favor either.

As previously noted, respondent argued with respect to factor (*ii*) that respondent lacked "the disposition to provide food, clothing and medical care"; that respondent had no obligation to provide for JV until she announced that she was pregnant; and that JV did not give respondent an opportunity to provide for her. Respondent further argues that he "had no realistic opportunity" to provide for REV and that any failure to provide for JV before she was pregnant was irrelevant. The trial court found that this factor did not favor respondent. However, as previously discussed, respondent JV's testimony suggests that there was a significant period prior to respondent's incarceration during which respondent knew JV was pregnant but wholly failed to provide for her. Therefore, it was reasonable for the court to infer that respondent lacked the disposition to provide for REV.

Factor (*iv*) concerns "[t]he length of time the adoptee has lived in a stable, satisfactory environment, and the desirability of maintaining continuity." Concerning this factor, the trial court found as follows:

> I'm not going to consider the child's current living environment.[4] No testimony regarding that otherwise. Desirability to maintain continuity. I'm going to instead find that Father has no stable, satisfactory environment. There is no continuity with him. There's no desirability of placing the child with him. He's in prison in a prison [sic] and unable to provide for the child.

Respondent argues that his testimony that he was making appropriate third-party care arrangements with his mother and his girlfriend that were adequate to meet REV's needs showed stability and permanence. However, the statute contemplates the existing environment and the desirability of maintaining continuity. Because REV has never lived with respondent's mother or girlfriend, there is no continuity with them to maintain, and respondent's argument is therefore without merit. Therefore, the trial court did not err by finding that factor (*iv*) did not favor respondent.

Factor (*v*) considers the permanence as a family unit of the putative father's home. Concerning this factor, the trial court found:

---

[4] This was presumably on the basis of this Court's statement in its previous opinion that the trial court is not permitted to compare respondent to the prospective adoptive parents. *In re REV*, unpub op at 11.

We're just going to look at the permanence of the family unit for Dad. He has no permanent family unit. . . . He has a girlfriend. That's fine. He's been in prison for quite some period of time, however. In prison for a couple of months. In jail for quite some period of time. There is no existing proposed custodial home or home. The testimony was that he doesn't have someplace set up. He's working on it. So, there's none of that.

Respondent argues that he testified that he has "options, between his mother and his girlfriend" and that his testimony was not refuted. However, respondent's testimony did not establish that his mother or his girlfriend agreed to having REV live with them until respondent's release from prison. Moreover, a girlfriend with whom respondent has not had a particularly long-term relationship is a far cry from a permanent family unit. The trial court did not err by finding that this factor did not favor respondent.

Factor (*vi*) considers the putative father's moral fitness. Respondent contends that the trial court "did not really make any finding." However, the record suggests that the trial court appropriately considered respondent's criminal activity, particularly his assaultive behavior, in finding that factor (*vi*) did not favor respondent.[5] Respondent's criminal activity is morally questionable conduct that is relevant to parental moral fitness. See *Fletcher v Fletcher*, 447 Mich 871, 887 n 6; 526 NW2d 889 (1994).

Factor (*vii*) considers the mental and physical health of the putative father and the child. Concerning this factor, the trial court found as follows:

[Respondent] says he has good physical health. I don't have any history of mental health issues. I'll find that that factor is in his favor or that it's neutral, but it's— there's no testimony that he doesn't have an appropriate mental health and is physically healthy based on his own testimony.

Respondent correctly contends that the trial court did not make findings regarding REV's physical and mental health, although we don't agree with his contention that this evidences a total failure to apply MCL 710.22(g). However, it is unclear how the failure to make findings regarding REV's physical and mental health harmed respondent. Indeed, the trial court did not find that this factor weighed against respondent, despite hinting during its analysis of factor (*vi*) that drug abuse would be an appropriate consideration regarding a party's health, and respondent does not even argue that considering REV's health would have helped him.

Factor (*viii*) concerns the child's "home, school, and community record," and respondent takes exception to the trial court's purported failure to consider this factor. The trial court concluded that the factor was irrelevant because REV had "no community or home or school record" at that time. While the court stated that it was "not going to consider that," it actually did

---

[5] Notably, the trial court made a point of stating that respondent's drug use was not an issue of moral fitness.

consider the factor and deem it inapplicable. Because REV was only 14 months old at the time, the trial court did not err with respect to how it proceeded regarding this factor.

Factor (*x*) concerns the ability and willingness of the adopting individual or individuals to adopt the child's siblings. The trial court did not address this factor. It appears that the trial court found, as it had previously, that this factor was irrelevant to these proceedings. *In re REV*, unpub op at 11. Given that it previously found that this factor was irrelevant and that this Court explicitly found that the trial court's findings regarding best interests were not erroneous, *id*. at 18, we discern no error from the court's decision not to address this factor. Regardless, respondent has not even attempted to establish that he was harmed by this.

Finally, respondent takes exception with the trial court's consideration of domestic violence as a factor in its analysis because it was "not one of the factors set forth in the statute." However, the statute expressly empowers trial courts to consider "[a]ny other factor" that it deems relevant to the proceeding, MCL 710.22(g)(*xi*), so this argument is plainly without merit.

Accordingly, we discern no errors warranting reversal with respect to the trial court's best-interest analysis. Given that only one of the applicable factors favored respondent, the trial court did not clearly err by finding that it would not be in REV's best interests for respondent to have custody. Because it was not in REV's best interests to grant respondent custody, the trial court properly terminated respondent's parental rights pursuant to MCL 710.39(1).

### III. CONCLUSION

The trial court properly concluded that respondent was not entitled to the heightened protections of MCL 710.39(2). The trial court properly concluded that respondent was unfit and that custody with him was not in the best interests of REV. Therefore, we conclude that the trial court did not err by terminating respondent's parental rights.

Affirmed.

/s/ Anica Letica
/s/ Noah P. Hood
/s/ Allie Greenleaf Maldonado