*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* SMITH-TAYLOR, Minors.

UNPUBLISHED
May 21, 2026
11:19 AM

No. 374296
Wayne Circuit Court
Family Division
LC No. 2019-002165-NA

Before: FEENEY, P.J., and GARRETT and BAZZI, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's orders terminating her parental rights to the minor children, DLS, DES, DS, and DST, under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). For the reasons set forth below, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This family came to the attention of Children's Protective Services (CPS) in the fall of 2019. At the time, respondent was married to E. Smith-Taylor, and they shared two children: DLS and DES. DS and DST were not yet born. Respondent threatened Smith-Taylor with a knife after smoking marijuana that was allegedly laced with another substance. Following this event, respondent fled from the ambulance that was transporting her to a mental health facility for evaluation. Four days later, respondent was found in a vehicle on the side of the road. She was incoherent and DES, then only three months old, was in the backseat of the vehicle. Respondent was admitted to the hospital for evaluation and treatment. DLS and DES remained in their father's care. Approximately 10 days later, DES was transported to the hospital with severe physical injuries, including a skull fracture, bilateral subdural hematomas, anoxic brain injury, liver lacerations, fractured ribs, and retinal hemorrhages. DLS, then 17 months old, also showed signs of physical abuse, although less severe.

Petitioner, the Department of Health and Human Services (DHHS), filed petitions seeking termination of Smith-Taylor's parental rights. Regarding respondent, DHHS requested that the court take temporary custody of the children. However, in January 2020, DHHS filed an amended petition seeking termination of respondent's parental rights to DES and DLS at the initial

-1-

disposition. Because DHHS now sought termination at the initial disposition and it concluded that aggravated circumstances were present, DHHS did not prepare a parent-agency treatment plan (PATP) for respondent.

In the summer of 2020, respondent gave birth to her third child, DS. DHHS filed a permanent custody petition relative to this newborn child on September 15, 2020. Eventually, the petitions were combined, the statutory grounds and best-interest hearings were held and, in February 2021, the trial court terminated respondent's parental rights to DLS, DES, and DS. Respondent appealed, and on October 14, 2021, this Court affirmed the trial court's orders. *In re Smith-Taylor*, 339 Mich App 189; 981 NW2d 511 (2021), rev'd 509 Mich 935 (2022). However, on April 8, 2022, in lieu of granting leave, the Michigan Supreme Court reversed this Court's decision and remanded to the trial court for further proceedings. *In re Smith-Taylor*, 509 Mich 935 (2022). The Supreme Court first explained that before DHHS is excused from making reasonable efforts toward reunification, there must be a judicial determination that the parent has subjected the child to aggravated circumstances. *Id*. at 935. It then noted that "[a]ggravated circumstances are present both for a parent who is a suspected perpetrator of such abuse and a parent who is suspected of placing the child at an unreasonable risk of harm due to the parent's failure to take reasonable steps to intervene to eliminate that risk[.]" *Id.* at 935-936 (quotation marks and citation omitted; second alteration in original). However, the Supreme Court held that this Court had misconstrued the factual record when it found that respondent allowed the children to stay with their father during respondent's hospitalization. *Id*. at 936. The Court noted that, to the contrary, the record showed that respondent told a CPS investigator that the children would not be safe in the father's home. *Id*. The Supreme Court held:

> The panel's conclusion that there were aggravated circumstances—based on a misunderstanding of the facts—cannot justify the Department's failure to make reasonable efforts. The Department agrees. Its joint motion filed in this Court concedes that it was required to make reasonable efforts all along and failed to do so. Because we agree with the Department that it was required to make reasonable efforts, we reverse the panel's decision in this case and remand the case to the trial court so that the Department may do so. [*Id*.]

Consistent with the Supreme Court's order, this matter was remanded to the trial court for further proceedings. *Id.*

After remand, a PATP was developed and respondent was offered a multitude of services. While respondent worked toward reunification, she gave birth to her fourth child, DST, in the summer of 2023. Similar to the other children, DHHS filed a petition, the court took jurisdiction over the child, and respondent was ordered to comply with her treatment plan.

When respondent's progress was deemed insufficient, DHHS, in May 2024, filed a supplemental petition seeking termination of respondent's parental rights to all four children. The trial court held hearings on the termination petition on August 13, 2024; September 18, 2024; and November 22, 2024. At the conclusion of the hearings, the trial court found that there existed clear and convincing evidence to terminate respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j) and that a preponderance of the evidence supported a finding that termination of parental rights was in the children's best interests. This appeal followed.

-2-

## II. ANALYSIS

### A. REASONABLE EFFORTS-PATP

Respondent first argues that the trial court erred when terminating her parental rights because DHHS failed to make reasonable efforts to reunify her with her children. Specifically, respondent contends that DHHS did not properly prepare or update the PATP. This Court reviews for clear error a trial court's decision regarding reasonable efforts. *In re Sanborn*, 337 Mich App 252, 258; 976 NW2d 44 (2021). A finding is clearly erroneous when, after reviewing the entire record, this Court is left with the definite and firm conviction that a mistake has been made. *In re Rood*, 483 Mich 73, 91; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.).

Generally, before a court may contemplate termination of a parent's parental rights, DHHS must make reasonable efforts to reunite the family. MCL 712A.19a(2). Reasonable efforts must be made in all cases except those involving the circumstances delineated in MCL 712A.19a(2). *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). As part of these reasonable efforts, "the department must create a service plan[1] outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Sanborn*, 337 Mich App at 259 (quotation marks and citation omitted). "If a child continues in placement outside of the child's home, the case service plan shall be updated and revised at 90-day intervals . . . ." MCL 712A.18f(5). DHHS's statutory duties to update a parent's treatment plan and provide the parent with necessary and relevant reunification services continue throughout the case. *In re Mason*, 486 Mich at 156. "The adequacy of the [DHHS]'s efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Matamoros*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 371544); slip op at 4, quoting *In re Rood*, 483 Mich at 89 (opinion by CORRIGAN, J.) (quotation marks omitted).

On April 21, 2022, after remand, DHHS's contracted agency, the Children's Center, prepared a treatment plan. The PATP did not take the form of a traditional plan but was a much more cursory document. In the plan's introductory paragraph, the author noted that Michigan's statewide automated child welfare information system, the system that generates PATPs, "was unable to generate the parent agent [sic] treatment plan due to the status of the case." Presumably, this comment referred to the fact that the Supreme Court had only days earlier remanded the matter to the trial court. The document further explained that if the system could generate the PATP, the plan would require respondent to: obtain and maintain suitable housing; obtain and maintain employment or a legal source of income; participate in parenting classes, particularly, for a child with medical needs; participate with a parent-partner; participate in individual and family therapy when and if suitable; participate in a substance abuse assessment or treatment and follow the recommendations; submit to random drug screens; attend parenting time; and participate in psychological and psychiatric evaluations and follow the recommendations. The plan also

---

[1] "The case service plan may be referred to using different names than case service plan including, but not limited to, a parent/agency agreement or a parent/agency treatment plan and service agreement." MCL 712A.13a(d).

required that respondent attend court hearings, maintain contact with the caseworker, provide the caseworker documentation of progress, and execute a release of information.

At the April 26, 2022 dispositional review hearing that followed, the trial court ordered respondent to obtain and maintain suitable housing and employment, attend parenting time, complete a parenting class, attend individual therapy, work with a parent-partner, attend a substance abuse assessment, submit drug screens, and participate in psychological and psychiatric evaluations. This order was consistent with the proposed treatment plan generated by the agency on April 21, 2022.

After the preparation of this initial plan, it does not appear that DHHS or its agency updated the PATP for over a year. In April 2023, respondent filed a motion requesting, among other things, that DHHS be ordered to prepare an updated service plan. On May 30, 2023, the trial court granted the request and ordered the Children's Center to work with respondent and her attorney to create an updated plan. On June 21, 2023, the agency prepared an updated PATP. The plan fully addressed actions that respondent needed to take to work toward reunification. It did not, however, address actions DHHS or its agency were obligated to perform. Further, following a dispositional review hearing on July 5, 2023, the court ordered that the June 21, 2023 PATP be amended to include that respondent participate in family therapy with DLS and DS and that respondent consider participating in domestic violence therapy. It does not appear from the existing record that DHHS prepared any other service plans for the remainder of the case.

On this record, we agree with respondent that DHHS did not comply with its statutory requirements. The initial service plan from April 2021 clearly identified the reunification services required, but it did little more. The June 21, 2023 PATP was much more detailed regarding what was expected of respondent. However, it failed to set forth the actions DHHS was required to take to facilitate reunification. Furthermore, the record does not include any updated plans from June 2023 until respondent's parental rights were terminated in December 2024. In *In re MJC*, 349 Mich App 42, 58; 27 NW3d 122 (2023), this Court held that "[t]he failure to provide and regularly update a case service plan for a child protective proceeding in which a minor child was separated from a parent is a clear and obvious error." However, under the facts of this case, the error was harmless. See MCR 2.613(A). See also *In re Miller*, 347 Mich App 420, 429; 15 NW3d 287 (2023) (explaining that the harmless-error rule applies to child-protective proceedings). MCR 2.613(A) provides:

> An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice.

"To overcome this rule, a party must show that an error was prejudicial such that a failure to grant relief would be inconsistent with substantial justice, i.e., that it is more likely than not the error affected the case's outcome." *In re Miller*, 347 Mich App at 430. In this case, respondent cannot overcome the application of the harmless-error rule.

As explained in greater detail below, the June 2023 PATP fully set forth what was required of respondent to remove the barriers to reunification. Although the plan did not include DHHS's obligations, there is no question that DHHS referred respondent to a multitude of services. Respondent concedes as much in her brief on appeal. Respondent acknowledged that she participated in therapy with at least two providers and attended parenting classes, supportive visitation, and multiple psychological and psychiatric evaluations. Moreover, as discussed below, the services accommodated respondent's claimed disabilities. DHHS made reasonable efforts toward reunification. However, the record demonstrates that respondent did not comply with many of her services and, in many respects, she failed to benefit from the services offered. Accordingly, respondent cannot establish that she would have successfully attained reunification if a proper treatment plan had been prepared and regularly updated. See, e.g., *In re MJC*, 349 Mich App at 54-58. Consequently, she is not entitled to relief.

## B. REASONABLE EFFORTS-ACCOMMODATION

Respondent next asserts that DHHS failed to make reasonable efforts toward reunification by failing to accommodate a disability related to her diagnoses of bipolar disorder and other mental health issues. Respondent does not specifically identify what services were required to accommodate her disability, but simply states that she needed "consistent mental-health treatment and supportive services to help her regulate stress, process trauma, and sustain stability." Respondent further states that DHHS "failed to conduct any ADA [Americans with Disabilities Act, 42 USC 12101 *et seq*.,] assessment, make any individualized modifications, or consult with her treating providers to ensure that the case service plan was reasonably accessible given her disabilities." Because the existing record establishes that DHHS was aware of respondent's mental health diagnoses and made referrals that accommodated respondent, we find no merit to respondent's arguments. After reviewing the record, it is readily apparent that DHHS made reasonable efforts to reunify respondent with her children and that termination of her parental rights was a product of her failure to participate in and benefit from the services rather than the adequacy of DHHS's efforts.

Again, generally, before a court may terminate a parent's parental rights, DHHS must make reasonable efforts to reunite the family. MCL 712A.19a(2). "Title II of the ADA requires that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' " *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017), quoting 42 USC 12132. In *In re Terry*, 240 Mich App 14, 24-25; 610 NW2d 563 (2000), this Court noted that the ADA does not provide a defense to proceedings to terminate parental rights. However, the ADA does require the petitioner to reasonably accommodate a disabled parent when providing services directed at removing the barriers to reunification. *In re Hicks/Brown*, 500 Mich at 86.

After the Supreme Court reversed the termination of respondent's parental rights and remanded the matter to trial court for the implementation of a treatment plan, DHHS, early on, referred respondent for a psychological evaluation and a psychiatric evaluation. The recommendations made in these evaluations offered guidance when determining what services respondent required to facilitate reunification. The psychologist recommended that respondent

continue individual psychotherapy, undergo a psychiatric evaluation, and participate in parenting classes. The psychiatrist recommended that respondent continue with individualized therapy, parenting classes, visitation, and the services of a parent support partner. Further, it was suggested that respondent could benefit from resuming or initiating medication management services to treat and manage the symptoms associated with bipolar disorder, mood disorder, depression, post-traumatic stress disorder, and childhood trauma.

A review of the record establishes that DHHS's referrals were consistent with the recommendations made by the clinicians. DHHS referred respondent to individual therapy, family therapy, and domestic violence counseling. Indeed, not only was respondent referred to court-ordered therapy, she continued to treat with the mental health providers at Team Wellness, an agency she had treated with since 2015. Thus, DHHS's referrals complied with respondent's suggestion that she required consistent mental health services.

Moreover, the record further establishes that respondent had supportive services to assist her. DHHS referred respondent to parenting classes and offered parenting time. In this regard, respondent was provided "hands on" assistance through the Infant Mental Health program and the supportive visitation program. These services provided respondent with real-time intensive assistance both before and during visitation, not only with DLS, DS, and DST, but also with DES, her disabled child.

In addition to the foregoing services, respondent sought out her own resources. As a child, respondent was placed in the foster-care system. During the lower court proceedings, respondent received services from New Foster Care (NFC), an agency that provided services to individuals that aged out of the foster-care system. One of the programs through NFC involved assigning a "transition navigator" to assist respondent. At the dispositional review hearing in February 2023, Jodee Forster, respondent's transitional navigator, testified that she worked with respondent on seeking employment, setting up services with Michigan Rehabilitation Services, and preparing her home for the return of the children. Forster also helped respondent with her "daily living life skills." Respondent also saw a therapist at NFC and participated in the women's support group. Forster commented that respondent was "good at finding out how to have her needs met." Forster further noted that respondent was able to "comprehend and understanding everything" that Forster was working on with her. In addition to Forster's assistance, respondent also had the support of a care coordinator from Team Wellness whose responsibilities included helping respondent find resources. Even respondent's attorney acknowledged that respondent was very good at advocating for herself.[2]

The record demonstrates that respondent was referred for the necessary treatment and had the necessary support services in place to help her succeed. Notwithstanding the efforts of DHHS and other agencies, however, the record shows that respondent repeatedly refused services and was

---

[2] While the trial court did not expressly recognize that respondent required services tailored to her disability pursuant to *In re Hicks/Brown*, it appears that respondent was provided such individualized services from NFC and her "transition navigator" since November 2022, such that further DHHS services may have been duplicative.

often discharged from services for nonparticipation. The latter necessitated, at times, multiple rereferrals. Respondent refused bus passes or accepted them but did not use them to attend parenting time or services. Respondent also rejected the suggestion that her mental health issues be managed with medications.

Moreover, the burden is on the parent to identify other "services that would have been appropriate in light of such disability or how the services offered were deficient." *In re Sanborn*, 337 Mich App at 266-267. Respondent argues that DHHS should have tailored the service plan for ADA accommodation, yet she has not identified specific services that she required. In any event, respondent has done little to explain how different services would have benefited her more than the services that were offered.

The record confirms that DHHS made the necessary referrals but that respondent did not cooperate. Further, respondent has not explained how the outcome of this case would have been different had she been referred for different services. When challenging the services offered by DHHS, the respondent must establish that he or she would have fared better if other services were offered. *Id*. at 264. Respondent has not even attempted to meet this burden. On this record, respondent has failed to establish that the trial court erred when it concluded that DHHS accommodated her disabilities and made reasonable efforts toward reunification. Ultimately, respondent failed in her commensurate responsibility to participate in and benefit from services. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

## C.  STATUTORY GROUNDS

Next, respondent challenges the trial court's findings that the statutory grounds for termination were established by clear and convincing evidence. To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo*, 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Mason*, 486 Mich at 152.

At the outset, we note that the trial court found that DHHS presented clear and convincing evidence to support termination under four grounds: MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). However, respondent has failed to specifically address the termination of her parental rights under MCL 712A.19b(3)(c)(*i*) and (*ii*). "The failure to brief the merits of an allegation of error is deemed an abandonment of the issue." *In re JS & SM*, 231 Mich App 92, 98; 585 NW2d 326 (1998), overruled in part on other grounds by *In re Trejo*, 462 Mich at 353 n 10. Further, respondent did not challenge these grounds for termination in her statement of the questions involved. As a result, appellate review regarding those grounds may be considered waived. See *In re BKD*, 246 Mich App 212, 218; 631 NW2d 353 (2001). Accordingly, this Court can assume that the trial court did not clearly err when it found clear and convincing evidence to terminate respondent's parental rights pursuant to MCL 712A.19b(3)(c)(*i*) and (*ii*). *In re JS & SM*, 231 Mich App at 98-99. Furthermore, because only one statutory ground for termination must be established, respondent's failure to challenge the trial court's findings with respect to MCL 712A.19b(3)(c)(*i*) and (*ii*) would preclude appellate relief regarding her challenge to the statutory grounds. *In re JS & SM*, 231

Mich App at 98. Nonetheless, a thorough review of the record indicates that the trial court did not clearly err when it found that the statutory grounds for termination were established by clear and convincing evidence.

The trial court terminated respondent's parental rights to her four children under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j), which permit termination under the following circumstances:

>    (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
>    (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
>    (*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
>    (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * *
>
>    (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent.

After reviewing the record, we conclude that the trial court did not clearly err when it terminated respondent's parental rights under the foregoing grounds.

The evidence established that the conditions that first led to adjudication included respondent's mental health issues, domestic violence between her and her now ex-husband, and the life-threatening injuries DES sustained while in his father's care. The conditions that later arose and led to the court taking jurisdiction of the younger children included respondent's insufficient progress with court-ordered services. After the Supreme Court remanded this matter to the trial court in April 2022, the trial court ordered respondent to comply with a treatment plan designed to improve her parenting skills and address her mental health issues. The trial court ordered respondent to participate in parenting classes, parenting time, individual therapy, and random drug screens. Respondent was also ordered to submit to psychological and psychiatric

evaluations and to obtain and maintain suitable housing and a legal source of income. Later, family therapy and a domestic violence program, with an anger management component, were added to the treatment plan. Approximately two years after the Supreme Court's remand order, DHHS filed a supplemental petition, alleging that respondent failed to benefit from the services offered and seeking termination of respondent's parental rights.

During the review hearings held over a two-year period and the 2024 termination hearings, DHHS presented evidence that respondent did not substantially comply with or benefit from the treatment plan. Although respondent completed parenting classes in January 2024, she still struggled to redirect her children during parenting time and was unable to divide her attention among the children. The children frequently left the visitation room and ran down the halls. Respondent focused on the baby and did not pay attention to the older children, which caused DLS and DS to cry or act out for attention. Moreover, because there was little evidence that the children would be safe in her care, respondent never progressed beyond supervised parenting time.

Respondent's inconsistent visitation record further established that respondent's parenting skills had not improved. Respondent was allowed weekly supervised in-person parenting time with DLS, DS, and DST. After a new caseworker was assigned in July 2023, the new caseworker personally supervised at least 36 in-person visits. However, at the time of the August 2024 termination hearing, respondent had not attended in-person parenting time since April 2024. Respondent reported having transportation issues, so the agency provided her with bus passes. Even then, respondent failed to participate in parenting time. Because she was not attending in-person parenting time, the agency permitted respondent to have virtual visits with the children. Respondent only attended one virtual visit on July 29, 2024. The visit lasted 25 minutes, and then respondent "hung up" with visitation time remaining. Later that night, respondent claimed in a text message that the battery on her phone was low. With respect to the other virtual visits, respondent confirmed the visits and then failed to appear or canceled at the last minute. Respondent's inconsistency suggested that she was unwilling to put her children's needs ahead of her own.

Regarding DES, the testimony established that respondent did not learn how to attend to the child's special needs. DES was placed in a specialized foster home on the west side of the state. In addition to a multitude of medical appointments, his caregivers were required to tend to his feeding tube, massage his constricting limbs, and position braces. The testimony established that because of respondent's CPS history, she could not participate in the medical training offered by the school district in which DES resided. However, DES's caseworker testified that respondent could receive training from the assisted care persons that transported DES to parenting time. The caseworker explained that the training by these individuals would provide respondent with the knowledge she needed to independently care for DES. These individuals had already explained to respondent DES's daily routine, and they showed her how to work DES's feeding tube. Unfortunately, respondent could never demonstrate the proficiency necessary to independently care for her child. Still, it was possible that if respondent attended parenting time, she could receive the proper training. In this regard, DES's caseworker noted at the August 2024 termination hearing that the last time respondent participated in in-person visitation with DES was July 25, 2024. The caseworker explained that after she was assigned to the case in June 2023, respondent was offered 39 parenting times, but she only attended 23 visits. Respondent's actions caused her to miss opportunities to learn how to care for her disabled child.

There was also clear and convincing evidence that respondent had not adequately addressed her mental health issues. Although respondent submitted to psychiatric and psychological assessments, and she generally attended individual therapy, she continued to be unable to regulate her emotions with the children, the caseworkers, and other staff members. Respondent yelled at her caseworker for no reason; hung up on the caseworker during phone calls; and during other calls, respondent was "all over the place." Moreover, respondent frequently denied that she had mental health issues, and she refused to consider managing her mental health issues with medication.

At the time of the August 2024 termination hearing, respondent was participating in domestic violence counseling with an anger management component, but she had not completed this program. Respondent had participated in only three or four of the 16 sessions. Moreover, between August 2023 and July 2024, the caseworker rereferred respondent to domestic violence classes six times because respondent was terminated early for nonparticipation. Respondent expressed the view that because the domestic violence was "not her fault," she did not need to attend the classes.

Respondent also failed to comply with the drug screening component of her treatment plan. The caseworker testified that respondent was required to screen once a week but, between August 2022 and May 2024, respondent submitted only 24 of the 29 requested screens. All of the screens were either positive for alcohol, marijuana, or both. Then, respondent failed to screen during the entire month of July 2024. Respondent was also offered the opportunity to screen when she attended parenting time at the Children's Center. Of the 73 screens offered at the Center, respondent refused to screen 55 times.

The caseworker acknowledged that respondent had safe, suitable housing. Indeed, she had maintained the same housing for three years. However, in June 2024, an event occurred related to her housing that confirmed that respondent continued to make poor decisions, and some of these decisions could clearly put her Section 8 housing at risk. Respondent reported to the caseworker that she was at a coworker's home and they were drinking. At the time, respondent was also babysitting someone's child. Respondent disclosed that, at some point, she awoke and did not have on any clothes. Respondent reported that she grabbed the child and ran next door to a neighbor's home. Respondent claimed that she called the police to report an assault, but she never provided the requested verification to the caseworker. Moreover, because the coworker knew where she lived, respondent refused to return to her home for several weeks.

The evidence also established that respondent did not have consistent employment. At the time of the termination hearing, respondent reported that she worked at Amazon. However, respondent previously reported to the caseworker that she had lost that employment because she had stopped going to work after the events involving her coworker. On three occasions, the caseworker asked that respondent provide verification of her employment but she failed to do so. Indeed, respondent had not verified her employment since November 2023.

The foregoing evidence clearly and convincingly demonstrated that, at the time of termination, more than 182 days had elapsed since the initial dispositional orders,[3] yet the conditions that led to the adjudication, and other conditions that arose thereafter, continued to exist. Respondent's parenting skills had not improved and her mental health issues had not been adequately addressed. Further, the record clearly established that these conditions were unlikely to be rectified within a reasonable time. Respondent had more than two years to make meaningful changes in her life, but she was unwilling or unable to do so. There was no evidence that if respondent were allowed additional time, she would be able to remove the barriers to reunification.

When determining whether a parent would be able to rectify the conditions that led to adjudication within a reasonable time, the focus is not only on how long it would take a respondent to improve her parenting skills, but also on how long her children "could wait for this improvement." *In re Dahms*, 187 Mich App 644, 648; 468 NW2d 315 (1991). In this case, the older children had been court wards for an extraordinary length of time; expecting them to wait any longer for respondent to work on her reunification services would be unreasonable. Termination of parental rights under § 19b(3)(c)(*i*) is warranted when "the totality of the evidence amply supports" a finding that the parent has not achieved "any meaningful change" in the conditions that led to the trial court assuming jurisdiction of the child. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). DHHS met this evidentiary burden by clear and convincing evidence. Accordingly, we conclude that the trial court did not clearly err when it found clear and convincing evidence to terminate respondent's parental rights under § 19b(3)(c)(*i*) and (c)(*ii*).

Because there was at least one statutory ground for termination, it is unnecessary to discuss whether the trial court erred by terminating respondent's parental rights under MCL 712A.19b(3)(g) and (j). *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). Nonetheless, considering the same evidentiary record, the court also did not clearly err when it found clear and convincing evidence to terminate respondent's parental rights under §§ 19b(3)(g) and (j). "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). "Similarly, a parent's failure to comply with the terms and conditions of his or

---

[3] Regarding the three oldest children, the statutory time requirements were effectively reset after the Supreme Court remanded the matter on April 8, 2022, for DHHS to make reasonable efforts toward reunification. In April 2022, the trial court entered a dispositional order requiring respondent to participate and benefit from a treatment plan. Thus, at the time the trial court terminated respondent's parental rights to DLS, DES, and DS, much more than 182 days had elapsed since the initial dispositional order. The 182-day analysis is slightly different relative to DST, who was born after the Supreme Court remanded the case to the trial court. Respondent gave birth to DST in the summer of 2023. DHHS filed a petition relative to this child shortly after the child's birth, and the court took jurisdiction and ordered respondent to comply with the existing treatment plan in January 2024. Thus, at the time the court terminated respondent's parental rights to DST in December 2024, more than 182 had elapsed since the initial dispositional order relative to DST specifically.

-11-

her service plan is evidence that the child will be harmed if returned to the parent's home." *Id*. at 711.

## D. PARENTING TIME

Respondent contends that DHHS failed to make reasonable efforts toward reunification because it failed to offer respondent consistent and meaningful parenting time. Respondent asserts that "the record demonstrates that visitation was sporadic, poorly coordinated, and repeatedly disrupted due to the Department's inaction and mismanagement . . . ." Respondent further states, "As detailed in the record, the Department allowed long gaps between visits, failed to provide timely transportation assistance, and often cancelled or curtailed parenting time without justification or court approval." However, respondent has provided virtually no record citation to support her claims. Under these circumstances, we could deem this argument abandoned. *Blackburne & Brown Mtg Co v Ziomek*, 264 Mich App 615, 619; 692 NW2d 388 (2004) ("An appellant may not merely announce its position or assert an error and leave it to this Court to discover and rationalize the basis for its claims, unravel or elaborate its argument, or search for authority for its position. Insufficiently briefed issues are deemed abandoned on appeal.") (quotation marks and citations omitted). In any event, we find that respondent's arguments are without merit.

Respondent has not identified which children she believes DHHS failed to meaningfully facilitate parenting time with, but we are inclined to assume that respondent's argument pertains to DES. After reviewing the record, we conclude that DHHS made reasonable efforts to facilitate in-person visitation between respondent and DES.

As a result of the events in November 2019, DES was left totally and permanently disabled. DES is blind and cannot walk or talk. He suffers seizures, is confined to a wheelchair, and experiences spasticity in his muscles. He also is fed through a feeding tube. The parties referred to DES as medically fragile. DES was placed in a specialized foster home on the west side of the state, approximately a three-hour drive from Wayne County. His caregivers were medically trained. Initially, respondent's visits with DES were virtual. Indeed, at the July 26, 2022 dispositional review hearing, the caseworker indicated that respondent's job schedule affected her availability but that the agency offered visits whenever respondent was available and at least once a week. Respondent objected to the virtual visits. In response, DES's caseworker indicated that because of DES's medical condition the virtual visits should continue.

The record suggests that for months, the parties struggled with trying to find a workable solution to the problems associated with coordinating in-person parenting time between respondent and DES. Respondent's counsel admitted that scheduling in-person parenting time with DES was logistically difficult. Counsel candidly admitted that in-person visits would be difficult for respondent to manage as she tried to navigate her treatment plan. But, after the logistics were eventually resolved, respondent did not take advantage of all the opportunities available to her to see her son.

The record does not support respondent's assertion that DHHS mismanaged coordinating in-person parenting time between respondent and DES. Rather, it is apparent that arranging in-person visits with a medically fragile child located three hours away, during the COVID-19

pandemic, when both the child and the parent were unvaccinated, proved to be a difficult endeavor. Moreover, once a solution was reached, it is equally apparent that respondent did not take advantage of all the opportunities available to visit her child. Respondent has not established that DHHS failed to make reasonable efforts to facilitate in-person parenting time.

## E.  BEST INTERESTS

Lastly, respondent argues that the trial court erred when it concluded that termination of her parental rights was in the children's best interests. Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009). After reviewing the record, we find no error in this regard.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When considering whether termination of parental rights is in a child's best interests, a court may consider a variety of factors. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). These factors include the bond between the child and the parent, the parent's ability to parent the child, the child's need for permanency and stability, the advantages of a foster home over the parent's home, the parent's compliance with the treatment plan, the parent's visitation history with the child, the child's well-being, and the possibility of adoption. *Id*. at 713-714. In addition, the trial court should consider the child's safety, including the risk of harm a child might face if returned to the parent's care. See *In re VanDalen*, 293 Mich App 120, 142; 809 NW2d 412 (2011). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich App at 131.

"The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App at 713. The court's focus must be on the child and not the parent. *In re Moss*, 301 Mich App at 87. Of note, when more than one child is involved, a trial court must consider each child's best interests separately. *In re Olive/Metts,* 297 Mich App 35, 40; 823 NW2d 144 (2012). A trial court need not, however, make "individual" and "redundant factual findings" if the children's interests do not significantly differ. *In re White*, 303 Mich App at 715-716. Further, in the majority of cases, it is in the child's best interests to be placed with his or her siblings. *In re Olive/Metts*, 297 Mich App at 41-42.

Although the children shared many of the same needs and interests, they were not similarly situated. More to the point, DES was not similarly situated to his three siblings. The trial court recognized the differing attributes between the children, and, in its opinion, it considered the best interests of each child individually. Moreover, the court also recognized that there were common elements pertinent to evaluating the best interests of each child. In the end, the trial court engaged in a comprehensive analysis of the factors, and it did not clearly err when it found that termination of respondent's parental rights was in each child's best interests.

## 1. DES

DES, respondent's disabled child, was five years old at the time of termination. His situation differed from his half siblings in several respects. After he was removed from respondent's home, he was placed in a specialized foster home. His caregivers were medically trained, and they were able to ensure that all of DES's needs were met. Further, the caregivers were willing to adopt DES should the court terminate respondent's parental rights.

By contrast, there was no evidence that respondent could meet DES's extraordinary needs. Respondent failed to take advantage of the visitation offered and, as a consequence, respondent missed opportunities to receive training related to DES's medical care. Although respondent received some training related to DES's feeding tube, respondent failed to demonstrate the proficiency required to independently care for DES. Further, respondent did not participate in and sufficiently benefit from the treatment plan. On this record, more than a preponderance of the evidence supported the trial court's finding that the foster home was preferable to the home respondent could offer DES and that the child would be at risk of harm if returned to respondent's care. When considering a child's best interests, the court may consider the advantages of a foster home over the parent's home. *In re Olive/Metts*, 297 Mich App at 42. Further the trial court may consider the possibility of adoption. *In re White*, 303 Mich App at 713.

## 2. DLS, DS, AND DST

At the time of termination, DLS was six years old, DS was five years old, and DST was almost 18 months old. The children were placed together in a nonrelative foster home. Both DS and DST had been wards of the court for their entire young lives. TB, the children's caregiver, was meeting all of the children's needs and she had expressed an interest in adopting the children should the court terminate respondent's parental rights. While respondent had suitable housing, she lacked the parenting skills to provide the children with a safe living environment.

A preponderance of the evidence supports a finding that the foster home was preferable to respondent's home because it provided DLS, DS, and DST with the care they required to facilitate their continued growth and development. Moreover, termination of respondent's parental rights provided an avenue by which these three children could achieve the stability, finality, and permanence they required.

The trial court also considered the nature of the parent-child bond and concluded that any bond that existed between respondent and these three children was weak. The caseworker's testimony supported the trial court's determination and showed that respondent could not properly engage with the children and focus her attention on the infant. The lack of a strong parent-child bond was a factor that weighed in favor of terminating respondent's parental rights.

Respondent asserts that the trial court erred because it failed to consider the fact that the three children were placed with a relative. We disagree. Relative placement is a factor that weighs against termination. *In re Olive/Metts*, 297 Mich App at 41-42. This is so because a relative caretaker may be open to allowing the parent to maintain a relationship with the child, and maintenance of that relationship may be in the child's best interests. *In re Mason*, 486 Mich at 168-169. However, while placement with a relative weighs against termination, it is not dispositive

because a trial court "may terminate parental rights in lieu of placement with relative if it finds that termination is in the child's best interests." *In re Olive/Metts*, 297 Mich App at 41-42. The trial court did not err in this regard because, contrary to respondent's representations, the children were not placed with a relative.

MCL 712A.13a was amended by 2022 PA 200, effective October 7, 2022. This statute now defines a "relative" as any adult who is:

> (*i*) Related to the child within the fifth degree by blood, marriage, or adoption, including the spouse of an individual related to the child within the fifth degree, even after the marriage has ended by death or divorce, the parent who shares custody of a half-sibling, and the parent of a man whom the court has found probable cause to believe is the putative father if there is no man with legally established rights to the child.

> (*ii*) Not related to a child within the fifth degree by blood, marriage, or adoption but who has a strong positive emotional tie or role in the child's life or the child's parent's life if the child is an infant, as determined by the department or, if the child is an Indian child, as determined solely by the Indian child's tribe. . . .

TB, the children's caregiver, testified that her aunt was respondent's foster mother when respondent was in foster care as a child. TB and respondent never lived together. At most, TB described them as "foster cousins" for a 3- or 4-year period. There was no testimony that TB had a strong emotional tie or role in the children's lives or in respondent's life before the placement. On this record, it cannot be said that the children were in relative placement. Accordingly, the court was not required to weigh the placement as a factor that weighed against termination of parental rights.

From this record, we cannot conclude that the trial court clearly erred when it found that termination of respondent's parental rights was in all four children's best interests. Ultimately, respondent could not safely and appropriately care for her children, and continuing a parent-child relationship would have been detrimental to the children's physical and emotional well-being. The court properly weighed the appropriate factors when considering all of the children's best interests. On balance, a preponderance of the evidence weighed in favor of terminating respondent's parental rights. Accordingly, the trial court did not clearly err.

Affirmed.

/s/ Kathleen A. Feeney
/s/ Kristina Robinson Garrett
/s/ Mariam S. Bazzi